## COLE *v.* YOUNG ET AL.

No. 442. Argued March 6, 1956.—Decided June 11, 1956.

*David I. Shapiro* argued the cause for petitioner. With him on the brief were *James H. Heller* and *Osmond K. Fraenkel.*

*Donald B. MacGuineas* argued the cause for respondents. On the brief were *Solicitor General Sobeloff, Assistant Attorney General Burger, Samuel D. Slade* and *Benjamin Forman.*

538

Opinion of the Court by MR. JUSTICE HARLAN, announced by MR. JUSTICE BURTON.

This case presents the question of the meaning of the term "national security" as used in the Act of August 26, 1950, giving to the heads of certain departments and agencies of the Government summary suspension and unreviewable dismissal powers over their civilian employees, when deemed necessary "in the interest of the national security of the United States." [1]

---

[1] § 1. "Notwithstanding the provisions of section 6 of the Act of August 24, 1912 (37 Stat. 555), as amended (5 U. S. C. 652), or the provisions of any other law, the Secretary of State; Secretary of Commerce; Attorney General; the Secretary of Defense; the Secretary of the Army; the Secretary of the Navy; the Secretary of the Air Force; the Secretary of the Treasury; Atomic Energy Commission; the Chairman, National Security Resources Board; or the Director, National Advisory Committee for Aeronautics, may, in his absolute discretion and when deemed necessary in the interest of national security, suspend, without pay, any civilian officer or employee of the Department of State (including the Foreign Service of the United States), Department of Commerce, Department of Justice, Department of Defense, Department of the Army, Department of the Navy, Department of the Air Force, Coast Guard, Atomic Energy Commission, National Security Resources Board, or National Advisory Committee for Aeronautics, respectively, or of their several field services: *Provided,* That to the extent that such agency head determines that the interests of the national security permit, the employee concerned shall be notified of the reasons for his suspension and within thirty days after such notification any such person shall have an opportunity to submit any statements or affidavits to the official designated by the head of the agency concerned to show why he should be reinstated or restored to duty. The agency head concerned may, following such investigation and review as he deems necessary, terminate the employment of such suspended civilian officer or employee whenever he shall determine such termination necessary or advisable in the interest of the national security of the United States, and such determination by the agency head concerned shall be conclusive and final: *Provided further,* That any employee having a permanent or indefinite appointment, and having completed his probationary or trial period, who is a citizen

Petitioner, a preference-eligible veteran under § 2 of the Veterans' Preference Act of 1944, 58 Stat. 387, as amended, 5 U. S. C. § 851, held a position in the classified civil service as a food and drug inspector for the New York

of the United States whose employment is suspended under the authority of this Act, shall be given after his suspension and before his employment is terminated under the authority of this Act, (1) a written statement within thirty days after his suspension of the charges against him, which shall be subject to amendment within thirty days thereafter and which shall be stated as specifically as security considerations permit; (2) an opportunity within thirty days thereafter (plus an additional thirty days if the charges are amended) to answer such charges and to submit affidavits; (3) a hearing, at the employee's request, by a duly constituted agency authority for this purpose; (4) a review of his case by the agency head, or some official designated by him, before a decision adverse to the employee is made final; and (5) a written statement of the decision of the agency head: *Provided further,* That any person whose employment is so suspended or terminated under the authority of this Act may, in the discretion of the agency head concerned, be reinstated or restored to duty, and if so reinstated or restored shall be allowed compensation for all or any part of the period of such suspension or termination in an amount not to exceed the difference between the amount such person would normally have earned during the period of such suspension or termination, at the rate he was receiving on the date of suspension or termination, as appropriate, and the interim net earnings of such person: *Provided further,* That the termination of employment herein provided shall not affect the right of such officer or employee to seek or accept employment in any other department or agency of the Government: *Provided further,* That the head of any department or agency considering the appointment of any person whose employment has been terminated under the provisions of this Act may make such appointment only after consultation with the Civil Service Commission, which agency shall have the authority at the written request of either the head of such agency or such employee to determine whether any such person is eligible for employment by any other agency or department of the Government.

"Sec. 3. The provisions of this Act shall apply to such other departments and agencies of the Government as the President may,

District of the Food and Drug Administration, Department of Health, Education, and Welfare. In November 1953, he was suspended without pay from his position, pending investigation to determine whether his employment should be terminated. He was given a written statement of charges alleging that he had "a close association with individuals reliably reported to be Communists" and that he had maintained a "sympathetic association" with, had contributed funds and services to, and had attended social gatherings of an allegedly subversive organization.

Although afforded an opportunity to do so, petitioner declined to answer the charges or to request a hearing, as he had the right to do. Thereafter, the Secretary of the Department of Health, Education, and Welfare, after "a study of all the documents in [petitioner's] case," determined that petitioner's continued employment was not "clearly consistent with the interests of national security" and ordered the termination of his employment. Petitioner appealed his discharge to the Civil Service Commission, which declined to accept the appeal on the ground that the Veterans' Preference Act, under which petitioner claimed the right of appeal, was inapplicable to such discharges.

Petitioner thereafter brought an action in the District Court for the District of Columbia seeking a declaratory judgment that his discharge was invalid and that the Civil Service Commission had improperly refused to entertain his appeal, and an order requiring his reinstatement in his former position. The District Court granted the respondents' motion for judgment on the pleadings and dismissed the complaint. 125 F. Supp. 284. The

from time to time, deem necessary in the best interests of national security. If any departments or agencies are included by the President, he shall so report to the Committees on the Armed Services of the Congress." 64 Stat. 476, 5 U. S. C. §§ 22–1, 22–3.

Court of Appeals, with one judge dissenting, affirmed. 96 U. S. App. D. C. 379, 226 F. 2d 337. Because of the importance of the questions involved in the field of Government employment, we granted certiorari. 350 U. S. 900.

Section 14 of the Veterans' Preference Act, 58 Stat. 390, as amended, 5 U. S. C. § 863, provides that preference eligibles may be discharged only "for such cause as will promote the efficiency of the service" and, among other procedural rights, "shall have the right to appeal to the Civil Service Commission," whose decision is made binding on the employing agency. Respondents concede that petitioner's discharge was invalid if that Act is controlling. They contend, however, as was held by the courts below, that petitioner's discharge was authorized by the Act of August 26, 1950, *supra,* which eliminates the right of appeal to the Civil Service Commission. Thus the sole question for decision is whether petitioner's discharge was authorized by the 1950 Act.

The 1950 Act provides in material part that, notwithstanding any other personnel laws, the head of any agency to which the Act applies

> "may, in his absolute discretion and when deemed necessary in the interest of national security, suspend, without pay, any civilian officer or employee of [his agency] . . . . The agency head concerned may, following such investigation and review as he deems necessary, terminate the employment of such suspended civilian officer or employee whenever he shall determine such termination necessary or advisable in the interest of the national security of the United States, and such determination by the agency head concerned shall be conclusive and final: . . . ."

The Act was expressly made applicable only to the Departments of State, Commerce, Justice, Defense, Army,

Navy, and Air Force, the Coast Guard, the Atomic Energy Commission, the National Security Resources Board, and the National Advisory Committee for Aeronautics. Section 3 of the Act provides, however, that the Act may be extended "to such other departments and agencies of the Government as the President may, from time to time, deem necessary in the best interests of national security," and the President has extended the Act under this authority "to all other departments and agencies of the Government." [2] While the validity of this extension of the Act depends upon questions which are in many respects common to those determining the validity of the Secretary's exercise of the authority thereby extended to her,[3] we will restrict our consideration to the latter issue and assume, for purposes of this decision, that the Act has validly been extended to apply to the Department of Health, Education, and Welfare.

The Act authorizes dismissals only upon a determination by the Secretary that the dismissal is "necessary or advisable in the interest of the national security." That determination requires an evaluation of the risk of injury to the "national security" that the employee's retention would create, which in turn would seem necessarily to be a function, not only of the character of the employee and the likelihood of his misconducting himself, but also of the nature of the position he occupies and its relationship to the "national security." That is, it must be determined whether the position is one in which the employee's misconduct would affect the "national security." That, of course, would not be necessary if "national security" were

---

[2] § 1, Exec. Order No. 10450, 18 Fed. Reg. 2489, set forth in the Appendix, *post,* p. 558.

[3] Secretary Folsom, the present Secretary of the Department of Health, Education, and Welfare, has been substituted as respondent for the former Secretary Hobby.

used in the Act in a sense so broad as to be involved in *all* activities of the Government, for then the relationship to the "national security" would follow from the very fact of employment. For the reasons set forth below, however, we conclude (1) that the term "national security" is used in the Act in a definite and limited sense and relates only to those activities which are directly concerned with the Nation's safety, as distinguished from the general welfare; and (2) that no determination has been made that petitioner's position was affected with the "national security," as that term is used in the Act. It follows that his dismissal was not authorized by the 1950 Act and hence violated the Veterans' Preference Act.

## I.

In interpreting the 1950 Act, it is important to note that that Act is not the only, nor even the primary, source of authority to dismiss Government employees. The general personnel laws—the Lloyd-LaFollette [4] and Veterans' Preference Acts [5]—authorize dismissals for "such cause as will promote the efficiency of the service," and the ground which we conclude was the basis for petitioner's discharge here—a reasonable doubt as to his loyalty—was recognized as a "cause" for dismissal under those procedures as early as 1942.[6] Indeed, the President's so-called Loyalty Program, Exec. Order No. 9835, 12 Fed. Reg. 1935, which prescribed an absolute standard of loyalty to be met by all employees regardless of position, had been established pursuant to that general authority three years prior to the 1950 Act and remained in

---

[4] § 6, 37 Stat. 555, as amended, 5 U. S. C. § 652.

[5] § 14, 58 Stat. 390, as amended, 5 U. S. C. § 863.

[6] Civil Service War Regulations, § 18.2 (c) (7), September 26, 1942, 5 CFR, Cum. Supp., § 18.2 (c) (7).

effect for nearly three years after its passage.[7] Thus there was no want of substantive authority to dismiss employees on loyalty grounds, and the question for decision here is not whether an employee *can* be dismissed on such grounds but only the extent to which the summary *procedures* authorized by the 1950 Act are available in such a case.

As noted above, the issue turns on the meaning of "national security," as used in the Act. While that term is not defined in the Act, we think it clear from the statute as a whole that that term was intended to comprehend only those activities of the Government that are directly concerned with the protection of the Nation from internal subversion or foreign aggression, and not those which contribute to the strength of the Nation only through their impact on the general welfare.

Virtually conclusive of this narrow meaning of "national security" is the fact that, had Congress intended the term in a sense broad enough to include all activities of the Government, it would have granted the power to terminate employment "in the interest of the national security" to all agencies of the Government. Instead, Congress specified 11 named agencies to which the Act should apply, the character of which reveals, without doubt, a purpose to single out those agencies which are directly concerned with the national defense and which have custody over information the compromise of which might endanger the country's security, the so-called "sensitive" agencies. Thus, of the 11 named agencies, 8 are concerned with military operations or weapons development, and the other 3, with international

---

[7] Employees dismissed under the Loyalty Program were entitled to review by the Civil Service Commission's Loyalty Review Board, thus satisfying the requirements of § 14 of the Veterans' Preference Act. See *Kutcher* v. *Gray*, 91 U. S. App. D. C. 266, 199 F. 2d 783 (C. A. D. C. Cir.).

relations, internal security, and the stock-piling of strategic materials. Nor is this conclusion vitiated by the grant of authority to the President, in § 3 of the Act, to extend the Act to such other agencies as he "may, from time to time, deem necessary in the best interests of national security." Rather, the character of the named agencies indicates the character of the determination required to be made to effect such an extension. Aware of the difficulties of attempting an exclusive enumeration and of the undesirability of a rigid classification in the face of changing circumstances, Congress simply enumerated those agencies which it determined to be affected with the "national security" and authorized the President, by making a similar determination, to add any other agencies which were, or became, "sensitive." That it was contemplated that this power would be exercised "from time to time" confirms the purpose to allow for changing circumstances and to require a selective judgment, necessarily implying that the standard to be applied is a less than all-inclusive one.

The limitation of the Act to the enumerated agencies is particularly significant in the light of the fact that Exec. Order No. 9835, establishing the Loyalty Program, was in full effect at the time of the consideration and passage of the Act. In that Order, the President had expressed his view that it was of "vital importance" that *all* employees of the Government be of "complete and unswerving loyalty" and had prescribed a minimum loyalty standard to be applied to all employees under the normal civil service procedures. Had Congress considered the objective of insuring the "unswerving loyalty" of all employees, regardless of position, as a matter of "national security" to be effectuated by the summary procedures authorized by the Act, rather than simply a desirable personnel policy to be implemented under the normal civil service procedures, it surely would not

have limited the Act to selected agencies. Presumably, therefore, Congress meant something more by the "interest of the national security" than the general interest the Nation has in the loyalty of even "non-sensitive" employees.

We can find no justification for rejecting this implication of the limited purpose of the Act or for inferring the unlimited power contended for by the Government. Where applicable, the Act authorizes the agency head summarily to suspend an employee pending investigation and, after charges and a hearing, finally to terminate his employment, such termination not being subject to appeal. There is an obvious justification for the summary suspension power where the employee occupies a "sensitive" position in which he could cause serious damage to the national security during the delay incident to an investigation and the preparation of charges. Likewise, there is a reasonable basis for the view that an agency head who must bear the responsibility for the protection of classified information committed·to his custody should have the final say in deciding whether to repose his trust in an employee who has access to such information. On the other hand, it is difficult to justify summary suspensions and unreviewable dismissals on loyalty grounds of employees who are not in "sensitive" positions and who are thus not situated where they could bring about any discernible adverse effects on the Nation's security. In the absence of an immediate threat of harm to the "national security," the normal dismissal procedures seem fully adequate and the justification for summary powers disappears. Indeed, in view of the stigma attached to persons dismissed on loyalty grounds, the need for procedural safeguards seems even greater than in other cases, and we will not lightly assume that Congress intended to take away those safeguards in the absence of

some overriding necessity, such as exists in the case of employees handling defense secrets.

The 1950 Act itself reflects Congress' concern for the procedural rights of employees and its desire to limit the unreviewable dismissal power to the minimum scope necessary to the purpose of protecting activities affected with the "national security." A proviso to § 1 of the Act provides that a dismissal by one agency under the power granted by the Act "shall not affect the right of such officer or employee to seek or accept employment in any other department or agency of the Government," if the Civil Service Commission determines that the employee is eligible for such other employment. That is, the unreviewable dismissal power was to be used only for the limited purpose of removing the employee from the position in which his presence had been determined to endanger the "national security"; it could affect his right to employment in other agencies only if the Civil Service Commission, after review, refused to clear him for such employment. This effort to preserve the employee's procedural rights to the maximum extent possible hardly seems consistent with an intent to define the scope of the dismissal power in terms of the indefinite and virtually unlimited meaning for which the respondents contend.

Moreover, if Congress intended the term to have such a broad meaning that all positions in the Government could be said to be affected with the "national security," the result would be that the 1950 Act, though in form but an exception to the general personnel laws, could be utilized effectively to supersede those laws. For why could it not be said that national security in that sense requires not merely loyal and trustworthy employees but also those that are industrious and efficient? The relationship of the job to the national security being the same, its demonstrated inadequate performance because

of inefficiency or incompetence would seem to present a surer threat to national security, in the sense of the general welfare, than a mere doubt as to the employee's loyalty.

Finally, the conclusion we draw from the face of the Act that "national security" was used in a limited and definite sense is amply supported by the legislative history of the Act.

In the first place, it was constantly emphasized that the bill, first introduced as S. 1561 in the 80th Congress and passed as H. R. 7439 in the 81st Congress, was intended to apply, or to be extended, only to "sensitive" agencies, a term used to imply a close and immediate concern with the defense of the Nation.[8] Thus the Senate Committee on Armed Services, in reporting out S. 1561, stated:

> "This bill provides authority to terminate employment of indiscreet or disloyal employees who are employed in areas of the Government which are sensitive from the standpoint of national security.
>
> . . . . .
>
> "[Section 3 will permit] the President to determine additional sensitive areas and include such

---

[8] Congress' reluctance to extend such powers to all agencies of the Government is also indicated by the prior legislation. At various times since 1942, similar summary dismissal statutes, of limited duration, had been enacted, but these had been limited to the obviously "sensitive" military departments, 56 Stat. 1053, 63 Stat. 1023, and the State Department, 60 Stat. 458. The 1950 Act, introduced at the request of the Department of Defense, was designed to make the authority permanent, include several other "sensitive" agencies, and afford greater flexibility by permitting the President to extend the Act to other agencies which became "sensitive." H. R. Rep. No. 2330, 81st Cong., 2d Sess., p. 3; S. Rep. No. 1155, 80th Cong., 2d Sess., p. 4.

areas in the scope of the authorities contained in this bill.

. . . . .

"Insofar as the [addition of § 3] is concerned, it was recognized by all witnesses that there were other sensitive areas within the various departments of the Government which are now, or might in the future become, deeply involved in national security. . . . In view . . . of the fact that there are now and will be in the future other sensitive areas of equal importance to the national security, it is believed that the President should have authority to make a finding concerning such areas and by Executive action place those areas under the authorities contained in this act." [9]

The House Committee on Post Office and Civil Service reported that "The provisions of the bill extend only to departments and agencies which are concerned with vital matters affecting the national security of our Nation." [10] The committee reports on H. R. 7439 in the next Congress similarly referred to the bill as granting the dismissal power only to the heads of the "sensitive" agencies.[11] While these references relate primarily to the agencies to be covered by the Act, rather than to the exercise of the power within an agency, the standard for both is the same—in the "interests of the national security"—and the statements thus clearly indicate the restricted sense in which "national security" was used. In short, "national security" is affected only by "sensitive" activities.

---

[9] S. Rep. No. 1155, 80th Cong., 2d Sess., pp. 2–4.

[10] H. R. Rep. No. 2264, 80th Cong., 2d Sess., p. 2.

[11] H. R. Rep. No. 2330, 81st Cong., 2d Sess., pp. 2–5; S. Rep. No. 2158, 81st Cong., 2d Sess., p. 2.

Secondly, the history makes clear that the Act was intended to authorize the suspension and dismissal only of persons in sensitive positions. Throughout the hearings, committee reports, and debates, the bill was described as being designed to provide for the dismissal of "security risks." [12] In turn, the examples given of what might be a "security risk" always entailed employees having access to classified materials; they were security risks because of the risk they posed of intentional or inadvertent disclosure of confidential information.[13] Mr. Larkin, a representative of the Department of Defense, which Department had requested and drafted the bill, made this consideration more explicit:

"They are security risks because of their access to confidential and classified material. . . . But if they do not have classified material, why, there is no notion that they are security risks to the United States. They are security risks to the extent of having access to classified material." [14]

"A person is accused of being disloyal, but is cleared by the loyalty board, because there is not

[12] E. g., S. Rep. No. 2158, 81st Cong., 2d Sess., p. 2: "The purpose of the bill is to increase the authority of the heads of Government departments engaged in sensitive activities to summarily suspend employees considered to be bad security risks . . . ."

[13] For example, Mr. Murray, the Chairman of the Committee on Post Office and Civil Service, which had reported the bill, gave the following illustration of the purpose of the bill in opening the debate in the House: "For instance, an employee who is working in some highly sensitive agency doing very confidential, secret defense work and who goes out and gets too much liquor may unintentionally or unwittingly, because of his condition, confide to someone who may be a subversive, secret military information about the character of work he is doing in that department. He is, by his conduct, a bad security risk and should be discharged." 96 Cong. Rec. 10017.

[14] Hearings, House Committee on Post Office and Civil Service, on H. R. 7439, 81st Cong., 2d Sess., p. 67.

enough evidence against him. If that person is not in a sensitive job, it is not of any further concern to us. We are willing to take the view, that while we might have misgivings about his loyalty, he cannot prejudice our security because he does not have access to any of the classified or top secret material." [15]

It is clear, therefore, both from the face of the Act and the legislative history, that "national security" was not used in the Act in an all-inclusive sense, but was intended to refer only to the protection of "sensitive" activities. It follows that an employee can be dismissed "in the interest of the national security" under the Act only if he occupies a "sensitive" position, and thus that a condition precedent to the exercise of the dismissal authority is a determination by the agency head that the position occupied is one affected with the "national security." We now turn to an examination of the Secretary's action to show that no such determination was made as to the position occupied by petitioner.

## II.

The Secretary's action in dismissing the petitioner was expressly taken pursuant to Exec. Order No. 10450, 18 Fed. Reg. 2489,[16] promulgated in April 1953 to provide uniform standards and procedures for the exercise by agency heads of the suspension and dismissal powers under the 1950 Act. That Order prescribes as the standard for dismissal, and the dismissal notice given to petitioner contained, a determination by the Secretary that the employee's retention in employment "is not clearly consistent with the interests of national secu-

---

[15] *Id.*, at p. 72.

[16] The relevant portions of the Executive Order, as it stood at the time of petitioner's suspension and discharge, are printed in the Appendix, *post,* p. 558.

rity." [17] Despite this verbal formula, however, it is our view that the Executive Order does not in fact require the agency head to make any determination whatever on the relationship of the employee's retention to the "national security" if the charges against him are within the categories of the charges against petitioner—that is, charges which reflect on the employee's loyalty. Rather, as we read the Order, it enjoins upon the agency heads the duty of discharging any employee of doubtful loyalty, *irrespective* of the character of his job and its relationship to the "national security." That is, the Executive Order deems an adverse determination as to loyalty to satisfy the requirements of the statute without more.

The opening preamble to the Order recites, among other things, that "the interests of the national security require" that "all" Government employees be persons "of complete and unswerving loyalty." It would seem to follow that an employee's retention cannot be "clearly consistent" with the "interests of the national security" as thus defined unless he is "clearly" loyal—that is, unless there is no doubt as to his loyalty. And § 8 (a) indicates that that is in fact what was intended by the Order. That section provides that the investigation of an employee pursuant to the Order shall be designed to develop information "as to whether . . . [his employment] is

---

[17] Section 6 of the Order, which formally prescribes the standards for "termination," in terms adopts the very language of the statute, "necessary or advisable in the interests of the national security." Section 7, however, provides that a suspended employee "shall not be reinstated" unless the agency head determines that reinstatement is "clearly consistent with the interests of the national security." Since nonreinstatement of a suspended employee is equivalent to the termination of his employment, it is apparent that the "clearly consistent" standard of § 7 is the controlling one. See also §§ 2, 8, and 3 (a). In the view we take of the case, we need not determine whether the "clearly consistent" standard is, as petitioner contends, a more onerous one than the "necessary or advisable" standard.

clearly consistent with the interests of the national security," and prescribes certain categories of facts to which "such" information shall relate. The first category, § 8 (a)(1), includes nonloyalty-oriented facts which, in general, might reflect upon the employee's reliability, trustworthiness, or susceptibility to coercion, such as dishonesty, drunkenness, sexual perversion, mental defects, or other reasons to believe that he is subject to influence or coercion. Section 8 (a)(1) expressly provides, however, that such facts are relevant only "depending on the relation of the Government employment to the national security." The remaining categories include facts which, in general, reflect upon the employee's "loyalty," such as acts of espionage, advocacy of violent overthrow of the Government, sympathetic association with persons who so advocate, or sympathetic association with subversive organizations. § 8 (a)(2)–(8). Significantly, there is wholly absent from these categories—under which the charges against petitioner were expressly framed—any qualification making their relevance dependent upon the relationship of the employee's position to the national security. The inference we draw is that in such cases the relationship to the national security is irrelevant, and that an adverse "loyalty" determination is sufficient *ex proprio vigore* to require discharge.

Arguably, this inference can be avoided on the ground that § 8 (a) relates only to the scope of information to be developed in the investigation and not to the evaluation of it by the agency head. That is, while loyalty information is to be developed in all cases regardless of the nature of the employment, that does not mean that the agency head should not consider the nature of the employment in determining whether the derogatory information is sufficient to make the employee's continued employment not "clearly consistent" with the "national security." No doubt that is true to the extent

that the greater the sensitivity of the position the smaller may be the doubts that would justify termination; the Order undoubtedly leaves it open to an agency head to apply a stricter standard in some cases than in others, depending on the nature of the employment. On the other hand, by making loyalty information relevant in *all* cases, regardless of the nature of the job, § 8 (a) seems strongly to imply that there is a minimum standard of loyalty that must be met by all employees. It would follow that the agency head may terminate employment in cases where that minimum standard is not met without making *any* independent determination of the potential impact of the person's employment on the national security.

Other provisions of the Order confirm the inferences that may be drawn from § 8 (a). Thus § 3 (b) directs each agency head to designate as "sensitive" those positions in his agency "the occupant of which could bring about, by virtue of the nature of the position, a material adverse effect on the national security." By definition, therefore, some employees are admittedly not in a position to bring about such an effect. Nevertheless, the Order makes this distinction relevant only for purposes of determining the scope of the investigation to be conducted, not for purposes of limiting the dismissal power to such "sensitive" positions. Section 3 (a) is more explicit. That provides that the appointment of all employees shall be made subject to an investigation the *scope* of which shall depend upon the degree of adverse effect on the national security the occupant of the position could bring about, but which "in no event" is to be less than a prescribed minimum. But the sole purpose of such an investigation is to provide a basis for a "clearly consistent" determination. Thus the requirement of a minimum investigation of all persons appointed implies

that an adverse "clearly consistent" determination may be made as to any such employee, regardless of the potential adverse effect he could cause to the national security. Finally, the second "Whereas" clause of the preamble recites as a justification for the Order that "all persons . . . privileged to be employed . . . [by the Government should] be adjudged by mutually consistent and no less than minimum standards," thus implying that the Order prescribes minimum standards that all employees must meet irrespective of the character of the positions held, one of which is the "complete and unswerving loyalty" standard recited in the first "Whereas" clause of the preamble.

Confirmation of this reading of the Order is found in its history. Exec. Order No. 9835, *supra,* as amended by Exec. Order No. 10241, 16 Fed. Reg. 3690, had established the Loyalty Program under which all employees, regardless of their positions, were made subject to discharge if there was a "reasonable doubt" as to their loyalty. That Order was expressly revoked by § 12 of the present Executive Order. There is no indication, however, that it was intended thereby to limit the scope of the persons subject to a loyalty standard. And any such implication is negatived by the remarkable similarity in the preambles to the two Orders and in the kinds of information considered to be relevant to the ultimate determinations.[18] In short, *all* employees were still to be subject to at least a minimum loyalty standard, though under

---

[18] Executive Order No. 9835 recited that it was "of vital importance" that all employees be of "complete and unswerving loyalty"; Exec. Order No. 10450 recites that "the interests of the national security require" that all employees be of "complete and unswerving loyalty." Executive Order No. 9835 listed six factors to be considered "in connection with the determination of disloyalty" (Pt. V, § 2) ; these are repeated in substantially identical form in §§ 8 (a) (2),

new procedures which do not afford a right to appeal to the Civil Service Commission.

We therefore interpret the Executive Order as meaning that, when "loyalty" charges are involved, an employee may be dismissed regardless of the character of his position in the Government service, and that the agency head need make no evaluation as to the effect which continuance of his employment might have upon the "national security." We recognize that this interpretation of the Order rests upon a chain of inferences drawn from less than explicit provisions. But the Order was promulgated to guide the agency heads in the exercise of the dismissal power, and its failure to state explicitly what determinations are required leaves no choice to the agency heads but to follow the most reasonable inferences to be drawn. Moreover, whatever the practical reasons that may have dictated the awkward form of the Order, its failure to state explicitly what was meant is the fault of the Government. Any ambiguities should therefore be resolved against the Government, and we will not burden the employee with the assumption that an agency head, in stating no more than the formal conclusion that retention of the employee is not "clearly consistent with the interests of national security," has made any subsidiary determinations not clearly required by the Executive Order.

From the Secretary's determination that petitioner's employment was not "clearly consistent with the interests of national security," therefore, it may be assumed only that the Secretary found the charges to be true and that they created a reasonable doubt as to petitioner's loyalty. No other subsidiary finding may be inferred, however, for, under the Executive Order as we have interpreted it, no

(4), (5), (6), and (7) of Exec. Order No. 10450 as "information as to whether . . . [the employee's retention] is clearly consistent with the interests of the national security."

other finding was required to support the Secretary's action.[19]

From our holdings (1) that not all positions in the Government are affected with the "national security" as that term is used in the 1950 Act, and (2) that no determination has been made that petitioner's position was one in which he could adversely affect the "national security," it necessarily follows that petitioner's discharge was not authorized by the 1950 Act. In reaching this conclusion, we are not confronted with the problem of reviewing the Secretary's exercise of discretion, since the basis for our decision is simply that the standard prescribed by the Executive Order and applied by the Secretary is not in conformity with the Act.[20] Since petitioner's discharge

[19] That the Secretary similarly interpreted the Executive Order and did not in fact determine that petitioner's job was a "sensitive" one is confirmed by the respondents' concession that petitioner "did not have access to Government secrets or classified material and was not in a position to influence policy against the interests of the Government." Respondents' Brief, pp. 3–4; Record, p. 40.

[20] No contention is made that the Executive Order might be sustained under the President's executive power even though in violation of the Veterans' Preference Act. There is no basis for such an argument in any event, for it is clear from the face of the Executive Order that the President did not intend to override statutory limitations on the dismissal of employees, and promulgated the Order solely as an implementation of the 1950 Act. Thus § 6 of the Order purports to authorize dismissals only "in accordance with the said Act of August 26, 1950," and similar references are made in §§ 4, 5, and 7. This explicit limitation in the substantive provisions of the Order is of course not weakened by the inclusion of the "Constitution," as well as the 1950 and other Acts, in the omnibus list of authorities recited in the Preamble to the Order; it is from the Constitution that the President derives any authority to implement the 1950 Act at all. When the President expressly confines his action to the limits of statutory authority, the validity of the action must be determined solely by the congressional limitations which the President sought to respect, whatever might be the result were the President ever to assert his independent power against that of Congress.

was not authorized by the 1950 Act and hence violated the Veterans' Preference Act, the judgment of the Court of Appeals is reversed and the case is remanded to the District Court for further proceedings not inconsistent with this opinion.

*Reversed and remanded.*

[For dissenting opinion of MR. JUSTICE CLARK, joined by MR. JUSTICE REED and MR. JUSTICE MINTON, see *post,* p. 565.]

## APPENDIX TO OPINION OF THE COURT.

### EXECUTIVE ORDER 10450.

(18 Fed. Reg. 2489, as amended by Exec. Order No. 10491, Oct. 13, 1953, 18 Fed. Reg. 6583.)

WHEREAS the interests of the national security require that all persons privileged to be employed in the departments and agencies of the Government, shall be reliable, trustworthy, of good conduct and character, and of complete and unswerving loyalty to the United States; and

WHEREAS the American tradition that all persons should receive fair, impartial, and equitable treatment at the hands of the Government requires that all persons seeking the privilege of employment or privileged to be employed in the departments and agencies of the Government be adjudged by mutually consistent and no less than minimum standards and procedures among the departments and agencies governing the employment and retention in employment of persons in the Federal service:

Now, THEREFORE, by virtue of the authority vested in me by the Constitution and statutes of the United States, including section 1753 of the Revised Statutes of the

United States (5 U. S. C. 631); the Civil Service Act of 1883 (22 Stat. 403; 5 U. S. C. 632, *et seq.*); section 9A of the act of August 2, 1939, 53 Stat. 1148 (5 U. S. C. 118 j); and the act of August 26, 1950, 64 Stat. 476 (5 U. S. C. 22–1, *et seq.*), and as President of the United States, and deeming such action necessary in the best interests of the national security, it is hereby ordered as follows:

SECTION 1. In addition to the departments and agencies specified in the said act of August 26, 1950, and Executive Order No. 10237 of April 26, 1951, the provisions of that act shall apply to all other departments and agencies of the Government.

SEC. 2. The head of each department and agency of the Government shall be responsible for establishing and maintaining within his department or agency an effective program to insure that the employment and retention in employment of any civilian officer or employee within the department or agency is clearly consistent with the interests of the national security.

SEC. 3. (a) The appointment of each civilian officer or employee in any department or agency of the Government shall be made subject to investigation. The scope of the investigation shall be determined in the first instance according to the degree of adverse effect the occupant of the position sought to be filled could bring about, by virtue of the nature of the position, on the national security, but in no event shall the investigation include less than a national agency check (including a check of the fingerprint files of the Federal Bureau of Investigation), and written inquiries to appropriate local law-enforcement agencies, former employers and supervisors, references, and schools attended by the person under investigation: *Provided,* that upon request of the head of the department or agency concerned, the Civil Service Commission may, in its discretion, authorize such less

investigation as may meet the requirements of the national security with respect to per-diem, intermittent, temporary, or seasonal employees, or aliens employed outside the United States. Should there develop at any stage of investigation information indicating that the employment of any such person may not be clearly consistent with the interests of the national security, there shall be conducted with respect to such person a full field investigation, or such less investigation as shall be sufficient to enable the head of the department or agency concerned to determine whether retention of such person is clearly consistent with the interests of the national security.

(b) The head of any department or agency shall designate, or cause to be designated, any position within his department or agency the occupant of which could bring about, by virtue of the nature of the position, a material adverse effect on the national security as a sensitive position. Any position so designated shall be filled or occupied only by a person with respect to whom a full field investigation has been conducted: *Provided,* that a person occupying a sensitive position at the time it is designated as such may continue to occupy such position pending the completion of a full field investigation, subject to the other provisions of this order: *And provided further,* that in case of emergency a sensitive position may be filled for a limited period by a person with respect to whom a full field preappointment investigation has not been completed if the head of the department or agency concerned finds that such action is necessary in the national interest, which finding shall be made a part of the records of such department or agency.

SEC. 4. The head of each department and agency shall review, or cause to be reviewed, the cases of all civilian officers and employees with respect to whom there has

been conducted a full field investigation under Executive Order No. 9835 of March 21, 1947, and, after such further investigation as may be appropriate, shall re-adjudicate, or cause to be re-adjudicated, in accordance with the said act of August 26, 1950, such of those cases as have not been adjudicated under a security standard commensurate with that established under this order.

SEC. 5. Whenever there is developed or received by any department or agency information indicating that the retention in employment of any officer or employee of the Government may not be clearly consistent with the interests of the national security, such information shall be forwarded to the head of the employing department or agency or his representative, who, after such investigation as may be appropriate, shall review, or cause to be reviewed, and, where necessary, re-adjudicate, or cause to be re-adjudicated, in accordance with the said act of August 26, 1950, the case of such officer or employee.

SEC. 6. Should there develop at any stage of investigation information indicating that the employment of any officer or employee of the Government may not be clearly consistent with the interests of the national security, the head of the department or agency concerned or his representative shall immediately suspend the employment of the person involved if he deems such suspension necessary in the interests of the national security and, following such investigation and review as he deems necessary, the head of the department or agency concerned shall terminate the employment of such suspended officer or employee whenever he shall determine such termination necessary or advisable in the interests of the national security, in accordance with the said act of August 26, 1950.

SEC. 7. Any person whose employment is suspended or terminated under the authority granted to heads of de-

partments and agencies by or in accordance with the said act of August 26, 1950, or pursuant to the said Executive Order No. 9835 or any other security or loyalty program relating to officers or employees of the Government, shall not be reinstated or restored to duty or reemployed in the same department or agency and shall not be reemployed in any other department or agency, unless the head of the department or agency concerned finds that such reinstatement, restoration, or reemployment is clearly consistent with the interests of the national security, which finding shall be made a part of the records of such department or agency: *Provided,* that no person whose employment has been terminated under such authority thereafter may be employed by any other department or agency except after a determination by the Civil Service Commission that such person is eligible for such employment.

SEC. 8. (a) The investigations conducted pursuant to this order shall be designed to develop information as to whether the employment or retention in employment in the Federal service of the person being investigated is clearly consistent with the interests of the national security. Such information shall relate, but shall not be limited, to the following:

(1) Depending on the relation of the Government employment to the national security:

(i) Any behavior, activities, or associations which tend to show that the individual is not reliable or trustworthy.

(ii) Any deliberate misrepresentations, falsifications, or omissions of material facts.

(iii) Any criminal, infamous, dishonest, immoral, or notoriously disgraceful conduct, habitual use of intoxicants to excess, drug addiction, or sexual perversion.

(iv) An adjudication of insanity, or treatment for serious mental or neurological disorder without satisfactory evidence of cure.*

(v) Any facts which furnish reason to believe that the individual may be subjected to coercion, influence, or pressure which may cause him to act contrary to the best interests of the national security.

(2) Commission of any act of sabotage, espionage, treason, or sedition, or attempts thereat or preparation therefor, or conspiring with, or aiding or abetting, another to commit or attempt to commit any act of sabotage, espionage, treason, or sedition.

(3) Establishing or continuing a sympathetic association with a saboteur, spy, traitor, seditionist, anarchist, or revolutionist, or with an espionage or other secret agent or representative of a foreign nation, or any representative of a foreign nation whose interests may be inimical to the interests of the United States, or with any person who advocates the use of force or violence to overthrow the government of the United States or the alteration of the form of government of the United States by unconstitutional means.

(4) Advocacy of use of force or violence to overthrow the government of the United States, or of the alteration of the form of government of the United States by unconstitutional means.

(5) Membership in, or affiliation or sympathetic association with, any foreign or domestic organization,

---

*After the date of petitioner's discharge, this paragraph was amended, by Exec. Order No. 10548, Aug. 2, 1954, 19 Fed. Reg. 4871, to read:

"(iv) Any illness, including any mental condition, of a nature which in the opinion of competent medical authority may cause significant defect in the judgment or reliability of the employee, with due regard to the transient or continuing effect of the illness and the medical findings in such case."

association, movement, group, or combination of persons which is totalitarian, Fascist, Communist, or subversive, or which has adopted, or shows, a policy of advocating or approving the commission of acts of force or violence to deny other persons their rights under the Constitution of the United States, or which seeks to alter the form of government of the United States by unconstitutional means.

(6) Intentional, unauthorized disclosure to any person of security information, or of other information disclosure of which is prohibited by law, or willful violation or disregard of security regulations.

(7) Performing or attempting to perform his duties, or otherwise acting, so as to serve the interests of another government in preference to the interests of the United States.

(8) Refusal by the individual, upon the ground of constitutional privilege against self-incrimination, to testify before a congressional committee regarding charges of his alleged disloyalty or other misconduct.

. . . . .

SEC. 10. Nothing in this order shall be construed as eliminating or modifying in any way the requirement for any investigation or any determination as to security which may be required by law.

SEC. 11. On and after the effective date of this order the Loyalty Review Board established by Executive Order No. 9835 of March 21, 1947, shall not accept agency findings for review, upon appeal or otherwise. . . .

SEC. 12. Executive Order No. 9835 of March 21, 1947, as amended, is hereby revoked. For the purposes described in section 11 hereof the Loyalty Review Board and the regional loyalty boards of the Civil Service Commission shall continue to exist and function for a period of one hundred and twenty days from the effective date

of this order, and the Department of Justice shall continue to furnish the information described in paragraph 3 of Part III of the said Executive Order No. 9835, but directly to the head of each department and agency.

. . . . . .

SEC. 15. This order shall become effective thirty days after the date hereof.

DWIGHT D. EISENHOWER.

THE WHITE HOUSE,
 *April 27, 1953.*

MR. JUSTICE CLARK, with whom MR. JUSTICE REED and MR. JUSTICE MINTON join, dissenting.

Believing that the Court should not strike down the President's Executive Order on employee security by an interpretation that admittedly "rests upon a chain of inferences," we cannot agree to the judgment of reversal. In our opinion, the clear purpose of the Congress in enacting the Summary Suspension Act, 64 Stat. 476, is frustrated, and the Court's opinion raises a serious question of presidential power under Article II of the Constitution which it leaves entirely undecided.

Petitioner, a food and drug inspector employed in the Department of Health, Education and Welfare, was charged with having "established and . . . continued a close association with individuals reliably reported to be Communists." It was further charged that he had "maintained a continued and sympathetic association with the Nature Friends of America, which organization" is on the Attorney General's list; and "by [his] own admission, donated funds" to that group, contributed services to it and attended social gatherings of the same. Petitioner did not answer the charges but replied that they constituted an invasion of his private rights of associa-

tion. Although advised that he could have a hearing, he requested none, and was thereafter dismissed. The Secretary made a formal determination that petitioner's continued employment was not "clearly consistent with the interests of the national security," a determination entrusted to her by the Suspension Act. Although "such determination by the agency head concerned shall be conclusive and final" under the Act, the Court, by its interpretation, finds "that not all positions in the Government are affected with the 'national security' as that term is used . . . and that no determination has been made that petitioner's position was one in which he could adversely affect the 'national security.' " It, therefore, strikes down the President's Executive Order because "the standard prescribed by [it] and applied by the Secretary is not in conformity with the Act." This compels the restoration of the petitioner to Government service. We cannot agree.

We have read the Act over and over again, but find no ground on which to infer such an interpretation. It flies directly in the face of the language of the Act and the legislative history. The plain words of § 1 make the Act applicable to "any civilian officer or employee," not, as the majority would have it, "any civilian officer or employee *in a sensitive position.*" The Court would require not only a finding that a particular person is subversive, but also that he occupies a sensitive job. Obviously this might leave the Government honeycombed with subversive employees.

Although the Court assumes the validity of the President's action under § 3 extending the coverage of the Act to all Government agencies, the reasoning of the opinion makes that extension *a fortiori* unauthorized. The limitation the Court imposes deprives the extension of any force, despite the fact that § 3 has no limiting words whatever. And this is done in the face of legislative history

showing that Congress clearly contemplated that the coverage might be extended without limitation "to such other departments and agencies of the Government" that the President thought advisable. Senator Byrd commented, "Section 3 gives the President the right to classify every agency as a sensitive agency . . . . He could take the whole Government." And Senator Chapman remarked, "I do not see why the whole Government is not sensitive as far as that is concerned." Hearings before the Senate Committee on Armed Services, 81st Cong., 2d Sess., on H. R. 7439, pp. 15–16. Also, Congressman Holifield, during debates in the House, stated that the Act "applies potentially to every executive agency, not only the sensitive ones. . . . There is no distinction made in the bill between so-called sensitive employees, that is, employees who have access to confidential and secret information, and the regular employees." 96 Cong. Rec. 10023–10024.

The President believed that the national security required the extension of the coverage of the Act to all employees. That was his judgment, not ours. He was given that power, not us. By this action the Court so interprets the Act as to intrude itself into presidential policy making. The Court should not do this, especially where Congress has ratified the President's action. As required by the Act, the Executive Order was reported to the Congress and soon thereafter it came up for discussion and action in both the House and the Senate. It was the sense of the Congress at that time that the Order properly carried out the standards of the Act and was in all respects an expression of the congressional will. 99 Cong. Rec. 4511–4543, 5818–5990. In addition, Congress has made appropriations each subsequent year for investigations, etc., under its provisions. This in itself "stands as confirmation and ratification of the action of the Chief

Executive." *Fleming* v. *Mohawk Wrecking & Lumber Co.,* 331 U. S. 111, 116.

The President having extended the coverage of the Act to the Department of Health, Education, and Welfare, it became the duty of the Secretary to dismiss any employee whenever she deemed it "necessary or advisable in the interests of national security." She made such a finding. It is implicit in her order of dismissal. Her "evaluation as to the effect which continuance of [petitioner's] employment might have upon the 'national security' " has been made. She decided that he should be dismissed. Under the Act this determination is "conclusive and final."

There is still another reason why we should sustain the President's Executive Order. By striking it down, the Court raises a question as to the constitutional power of the President to authorize dismissal of executive employees whose further employment he believes to be inconsistent with national security. This power might arise from the grant of executive power in Article II of the Constitution, and not from the Congress. The opinion of the majority avoids this important point which must be faced by any decision holding an Executive Order inoperative.* It is the policy of the Court to avoid constitu-

---

*The majority excuses its failure to pass on this question by saying that no contention was made that the President's Order might be sustained under his executive powers. We cannot agree. The Government specifically asserted that "if Congress had meant to prohibit the President from acting in this respect under [the Act] a serious question as to the validity of that enactment would arise." It devoted eight pages of its brief to this point. Furthermore, the Court of Appeals noted that if it "thought the President's Order inconsistent with the act . . . [it] would have to decide the constitutional question thus presented." 96 U. S. App. D. C. 379, 382, 226 F. 2d 337, 340. As further justification, the majority contends that the President acted here only under the directions of the Act. In answer, we need quote only the enacting clause of the Presi-

tional questions where possible, *Peters* v. *Hobby,* 349 U. S. 331, 338, not to create them.

We believe the Court's order has stricken down the most effective weapon against subversive activity available to the Government. It is not realistic to say that the Government can be protected merely by applying the Act to sensitive jobs. One never knows just which job is sensitive. The janitor might prove to be in as important a spot security-wise as the top employee in the building. The Congress decided that the most effective way to protect the Government was through the procedures laid down in the Act. The President implemented its purposes by requiring that Government employment be "clearly consistent" with the national security. The President's standard is "complete and unswerving loyalty" not only in sensitive places but throughout the Government. The President requires, and every employee should give, no less. This is all that the Act and the Order require. They should not be subverted by the technical interpretation the majority places on them today. We would affirm.

---

dent's Order: "Now, therefore, by virtue of the authority vested in me by the Constitution and statutes of the United States . . . and as President of the United States." Executive Order No. 10450, 18 Fed. Reg. 2489. In issuing the Order, the President invoked all of his powers, and since his Order is voided by the majority as not being in conformity with the Act, the question of the scope of his other constitutional or statutory powers is presented.