# VITARELLI v. SEATON, SECRETARY OF THE INTERIOR, ET AL.

No. 101.  Argued April 1–2, 1959.—Decided June 1, 1959.

*Clifford J. Hynning* argued the cause for petitioner. With him on the brief was *Harry E. Sprogell.*

*John G. Laughlin, Jr.* argued the cause for respondents. With him on the brief were *Solicitor General Rankin, Assistant Attorney General Doub* and *Samuel D. Slade.*

MR. JUSTICE HARLAN delivered the opinion of the Court.

This case concerns the legality of petitioner's discharge as an employee of the Department of the Interior. Vitarelli, an educator holding a doctor's degree from Columbia University, was appointed in 1952 by the Department of the Interior as an Education and Training Specialist in the Education Department of the Trust Territory of the Pacific Islands, at Koror in the Palau District, a mandated area for which this country has responsibility.

By a letter dated March 30, 1954, respondent Secretary's predecessor in office notified petitioner of his suspension from duty without pay, effective April 2, 1954, assigning as ground therefor various charges. Essentially, the charges were that petitioner from 1941 to 1945

had been in "sympathetic association" with three named persons alleged to have been members of or in sympathetic association with the Communist Party, and had concealed from the Government the true extent of these associations at the time of a previous inquiry into them; that he had registered as a supporter of the American Labor Party in New York City in 1945, had subscribed to the USSR Information Bulletin, and had purchased copies of the Daily Worker and New Masses; and that because such associations and activities tended to show that petitioner was "not reliable or trustworthy" his continued employment might be "contrary to the best interests of national security."

Petitioner filed a written answer to the statement of charges, and appeared before a security hearing board on June 22 and July 1, 1954. At this hearing no evidence was adduced by the Department in support of the charges, nor did any witness testify against petitioner. Petitioner testified at length, and presented four witnesses, and he and the witnesses were extensively cross-examined by the security officer and the members of the hearing board. On September 2, 1954, a notice of dismissal effective September 10, 1954, was sent petitioner over the signature of the Secretary, reciting that the dismissal was "in the interest of national security for the reasons specifically set forth in the letter of charges dated March 30, 1954." This was followed on September 21, 1954, with the filing of a "Notification of Personnel Action" setting forth the Secretary's action. The record does not show that a copy of this document was ever sent to petitioner.

After having failed to obtain reinstatement by a demand upon the Secretary, petitioner filed suit in the United States District Court for the District of Columbia seeking a declaration that his dismissal had been illegal and ineffective and an injunction requiring his reinstatement. On October 10, 1956, while the case was pending in the

District Court, a copy of a new "Notification of Personnel Action," dated September 21, 1954, and reciting that it was "a revision of and replaces the original bearing the same date," was filed in the District Court, and another copy of this document was delivered to petitioner shortly thereafter. This notification was identical with the one already mentioned, except that it omitted any reference to the reason for petitioner's discharge and to the authority under which it was carried out.[1] Thereafter the District Court granted summary judgment for the respondent. That judgment was affirmed by the Court of Appeals, one judge dissenting. 102 U. S. App. D. C. 316, 253 F. 2d 338. We granted certiorari to consider the validity of petitioner's discharge. 358 U. S. 871.

The Secretary's letter of March 30, 1954, and notice of dismissal of September 2, 1954, both relied upon Exec. Order No. 10450, 18 Fed. Reg. 2489 (1953), the Act of August 26, 1950, 64 Stat. 476, 5 U. S. C. § 22–1 *et seq.,* and Department of the Interior Order No. 2738, all relating to discharges of government employees on security or loyalty grounds, as the authority for petitioner's dismissal. In *Cole* v. *Young,* 351 U. S. 536, this Court held that the statute referred to did not apply to government employees in positions not designated as "sensitive." Respondent takes the position that since petitioner's position in government service has at no time been designated as sensitive the effect of *Cole,* which was decided after the 1954 dismissal of petitioner, was to render also inapplicable to petitioner Department of the Interior Order No. 2738, under which the proceedings relating to petitioner's dismissal were had. It is urged

---

[1] An affidavit of the custodian of records of the Civil Service Commission, filed in the District Court together with this revised notification, states "That all records of the said Commission have been expunged of all adverse findings made with respect to Mr. William Vincent Vitarelli under Executive Order 10450."

that in this state of affairs petitioner, who concededly was at no time within the protection of the Civil Service Act, Veterans' Preference Act, or any other statute relating to employment rights of government employees, and who, as a "Schedule A" employee, could have been summarily discharged by the Secretary at any time without the giving of a reason, under no circumstances could be entitled to more than that which he has already received—namely, an "expunging" from the record of his 1954 discharge of any reference to the authority or reasons therefor.

Respondent misconceives the effect of our decision in *Cole.* It is true that the Act of August 26, 1950, and the Executive Order did not alter the power of the Secretary to discharge summarily an employee in petitioner's status, without the giving of any reason. Nor did the Department's own regulations preclude such a course. Since, however, the Secretary gratuitously decided to give a reason, and that reason was national security, he was obligated to conform to the procedural standards he had formulated in Order No. 2738 for the dismissal of employees on security grounds. *Service* v. *Dulles,* 354 U. S. 363. That Order on its face applies to *all* security discharges in the Department of the Interior, including such discharges of Schedule A employees. *Cole* v. *Young* established that the Act of August 26, 1950, did not permit the discharge of nonsensitive employees pursuant to procedures authorized by that Act if those procedures were more summary than those to which the employee would have been entitled by virtue of any pre-existing statute or regulation. That decision cannot, however, justify noncompliance by the Secretary with regulations promulgated by him in the departmental Order, which as to petitioner afford greater procedural protections in the case of a dismissal stated to be for security reasons than in the case of dismissal without any statement of reasons. Having chosen to proceed against petitioner on security

grounds, the Secretary here, as in *Service,* was bound by the regulations which he himself had promulgated for dealing with such cases, even though without such regulations he could have discharged petitioner summarily.

Petitioner makes various contentions as to the constitutional invalidity of the procedures provided by Order No. 2738. He further urges that even assuming the validity of the governing procedures, his dismissal cannot stand because the notice of suspension and hearing given him did not comply with the Order. We find it unnecessary to reach the constitutional issues, for we think that petitioner's second position is well taken and must be sustained.

Preliminarily, it should be said that departures from departmental regulations in matters of this kind involve more than mere consideration of procedural irregularities. For in proceedings of this nature, in which the ordinary rules of evidence do not apply, in which matters involving the disclosure of confidential information are withheld, and where it must be recognized that counsel is under practical constraints in the making of objections and in the tactical handling of his case which would not obtain in a cause being tried in a court of law before trained judges, scrupulous observance of departmental procedural safeguards is clearly of particular importance.[2] In this instance an examination of the record, and of the transcript of the hearing before the departmental security board, discloses that petitioner's procedural rights under the applicable regulations were violated in at least three material respects in the proceedings which terminated in the final notice of his dismissal.

*First,* § 15 (a) of Order No. 2738 requires that the statement of charges served upon an employee at the time

---

[2] As already noted, we do not reach the question of the constitutional permissibility of an administrative adjudication based on "confidential information" not disclosed to the employee.

of his suspension on security grounds "shall be as specific and detailed as security considerations, including the need for protection of confidential sources of information, permit . . . and shall be subject to amendment within 30 days of issuance.". Although the statement of charges furnished petitioner appears on its face to be reasonably specific;[3] the transcript of hearing establishes that the statement, which was never amended, cannot conceivably be said in fact to be as specific and detailed as "security considerations . . . permit." For petitioner was questioned by the security officer and by the hearing board in great detail concerning his association with and knowledge of various persons and organizations nowhere mentioned in the statement of charges,[4] and at length concerning his activities in Bucks County, Pennsylvania, and elsewhere after 1945, activities as to which the charges are also completely silent. These questions were presumably asked because they were deemed relevant to the inquiry before the board, and the very fact that they were asked and thus spread on the record is conclusive

---

[3] The substance of the charges has been stated on pp. 536–537, *supra.*

[4] The statement of charges referred to petitioner's alleged associations with only three named persons, "F———, W———, and W———." During the course of the hearing the security officer, however, asked "How well did you know L——— B———? . . . Did you ever meet H——— B——— C———? . . . Did you ever remember meeting a J——— L———?" Further, petitioner was questioned as to his knowledge of and relationships with a wide variety of organizations not mentioned in the statement of charges. Thus he was asked: "Do you know what Black Mountain Transcendentalism is? . . . Do you recall an organization by the name of National Council for Soviet-American Friendship? . . . How about the Southern Conference for Human Welfare? . . . What is the organization called the Joint Antifascist Refugee Committee? . . . Have you ever had any contact with the Negro Youth Congress? . . . How about Abraham Lincoln Brigade? . . . Have you ever heard of a magazine called 'Cooperative Union'? . . . I was wondering whether you had ever heard of Consumers Union?"

indication that "security considerations" could not have justified the omission of any statement concerning them in the charges furnished petitioner.

*Second,* §§ 21 (a) and (e) require that hearings before security hearing boards shall be "orderly" and that "reasonable restrictions shall be imposed as to relevancy, competency, and materiality of matters considered." The material set forth in the margin, taken from the transcript, and illustrative rather than exhaustive, shows that these indispensable indicia of a meaningful hearing were not observed.[5]   It is not an overcharacterization to say

---

[5] "Mr. Armstrong [the departmental security officer, inquiring about petitioner's activities as a teacher in a Georgia college]: Were these activities designed to be put into effect by both the white and the colored races? . . .   What were your feelings at that time concerning race equality? . . .   How about civil rights? Did that enter into a discussion in your seminar groups?"·

"Mr. Armstrong: Do I interpret your statement correctly that maybe Negroes and Jews are denied some of their constitutional rights at present?

"Mr. Vitarelli: Yes.

"Mr. Armstrong: In what way?

"Mr. Vitarelli: I saw it in the South where certain jobs were open to white people and not open to Negroes because they were Negroes. . . .   In our own university, there was a quota at Columbia College for the medical students.   Because they were Jewish, they would permit only so many.   I thought that was wrong.

"Chairman Towson: Doctor, isn't it also true that Columbia College had quotas by states and other classifications as well?

"Mr. Vitarelli: I don't remember that.   It may be true.

"Mr. Armstrong: In other words, wasn't there a quota on Gentiles as well as Jews?

"Mr. Vitarelli: . . . I had remembered that some Jews seemed to feel, and I felt, too, at the time, that they were being persecuted somewhat.

"Chairman Towson: Did you ever take the trouble to investigate whether or not they were or did you just accept their word?

that as the hearing proceeded it developed into a wide-ranging inquisition into this man's educational, social, and political beliefs, encompassing even a question as to whether he was "a religious man."

---

"Mr. Vitarelli: No, I didn't investigate it.

"Chairman Towson: You accepted their word for it.

"Mr. Vitarelli: I accepted the general opinion of the group of professors with whom I associated and was taught. . . .

"Chairman Towson: I am simply asking you to verify the vague impression I have that Columbia College puts a severe quota on residents of New York City, whatever their race, creed or color may be.

"Mr. Vitarelli: I think that is true. . . .

"Chairman Towson: Otherwise there would be no students at Columbia College except residents of New York City.

"Mr. Vitarelli: There may be a few others, but mostly New York City.

"Chairman Towson: Isn't it true that the quota system is designed by the college in order to make it available to persons other than live in New York City?

"Mr. Vitarelli: I believe that is the reason.

"Chairman Towson: And any exclusion of a resident of New York City would be for that reason, rather than the race, creed or color?

"Mr. Vitarelli: I think that is the way the policy is stated.

"Chairman Towson: Is it not a fact?

"Mr. Vitarelli: I don't think so. . . .

"Chairman Towson: Excuse me, Mr. Armstrong.

"Mr. Armstrong: I went to Columbia Law School for two years and certainly there was not any quota system there at that time, and that is a long time ago. All right, we are getting afield."

Petitioner was also asked the following questions by the security officer during the course of the hearing:

"Mr. Armstrong: I think you indicated in an answer or a reply to an interrogatory that you at times voted for and sponsored the principles of Franklin Delano Roosevelt, Norman A. Thomas, and Henry Wallace? . . . How many times did you vote for . . . [Thomas] if you care to say? . . . How about Henry Wallace? . . . How about Norman Thomas? Did his platform coincide more nearly with your ideas of democracy? . . . At one time, or two, you were a strong advocate of the United Nations. Are you

*Third,* § 21 (c)(4) gives the employee the right "to cross-examine any witness offered in support of the charges." It is apparent from an over-all reading of the regulations that it was not contemplated that this provision should require the Department to call witnesses to testify in support of any or all of the charges, because it was expected that charges might rest on information gathered from or by "confidential informants." We think, however, that § 21 (c)(4) did contemplate the calling by the Department of any informant not properly classifiable as "confidential," if information furnished by that informant was to be used by the board in assessing an employee's status.[6] The transcript shows that this

---

still? . . . The file indicates, too, that you were quite hepped up over the one world idea at one time; is that right?"

Witnesses presented by petitioner were asked by the security officer and board members such questions as:

"The Doctor indicated that he was acquainted with and talked to Norman Thomas on occasions. Did you know about that? . . . How about Dr. Vitarelli? Is he scholarly? . . . A good administrator? . . . Was he careless with his language around the students or careful? . . . Did you consider Dr. Vitarelli as a religious man? . . . Was he an extremist on equality of races? . . . In connection with the activities that Dr. Vitarelli worked on that you know about, either in the form of projects or in connection with the educational activities that you have mentioned, did they extend to the Negro population of the country? In other words, were they contacts with Negro groups, with Negro instructors, with Negro students, and so on?"

It is not apparent how any of the above matters could be material to a consideration of the question whether petitioner's retention in government service would be consistent with national security.

[6] This reading of the provision is supported by § 21 (e) of the Order, which provides in part that "if the employee is or may be handicapped by the nondisclosure to him of confidential information or by lack of opportunity to cross-examine confidential informants, the hearing board shall take that fact into consideration," thus implying that the employee is to have the right to cross-examine nonconfidential informants who provide material taken into consideration by the board.

provision was violated on at least one occasion at petitioner's hearing, for the security officer identified by name a person who had given information apparently considered detrimental to petitioner, thus negating any possible inference that that person was considered a "confidential informant" whose identity it was necessary to keep secret, and questioned petitioner at some length concerning the information supplied from this source without calling the informant and affording petitioner the right to cross-examine.[7]

Because the proceedings attendant upon petitioner's dismissal from government service on grounds of national security fell substantially short of the requirements of the applicable departmental regulations, we hold that such dismissal was illegal and of no effect.

Respondent urges that even if the dismissal of September 10, 1954, was invalid, petitioner is not entitled to reinstatement by reason of the fact that he was at all events validly dismissed in October 1956, when a copy of the second "Notification of Personnel Action," omitting all reference to any statute, order, or regulation relating to security discharges, was delivered to him. Granting that the Secretary could at any time after September 10, 1954, have validly dismissed petitioner without any statement of reasons, and independently of the proceedings taken against him under Order No. 2738, we cannot view the delivery of the new notification to petitioner as an exercise of that summary dismissal power. Rather, the fact that it was dated "9–21–54," contained a termination of employment date of "9–10–54," was designated as "a revision" of the 1954 notification, and was evidently filed in

---

[7] The information was to the effect that petitioner had criticized as "bourgeois" the purchase of a house by a woman associate in Georgia. Petitioner flatly denied that he had made the remark attributed to him, and said that he could never have made such a statement except in a spirit of levity.

the District Court before its delivery to petitioner indicates that its sole purpose was an attempt to moot petitioner's suit in the District Court by an "expunging" of the grounds for the dismissal which brought Order No. 2738 into play.[8] In these circumstances, we would not be justified in now treating the 1956 action, plainly intended by the Secretary as a grant of relief to petitioner in connection with the form of the 1954 discharge, as an exercise of the Secretary's summary removal power as of the date of its delivery to petitioner.[9]

It follows from what we have said that petitioner is entitled to the reinstatement which he seeks, subject, of course to any lawful exercise of the Secretary's authority hereafter to dismiss him from employment in the Department of the Interior.

*Reversed.*

MR. JUSTICE FRANKFURTER, whom MR. JUSTICE CLARK, MR. JUSTICE WHITTAKER and MR. JUSTICE STEWART join, concurring in part and dissenting in part.

An executive agency must be rigorously held to the standards by which it professes its action to be judged. See *Securities & Exchange Comm'n* v. *Chenery Corp.,* 318 U. S. 80, 87–88. Accordingly, if dismissal from

---

[8] The Secretary successfully took the position in the courts below that the only possible defect in the 1954 discharge was the articulation of the "national security" grounds therefor, and that since that defect did not void the dismissal as such, an "expunging" of these grounds gave petitioner the maximum relief to which he could possibly be entitled.

[9] Respondent's brief in this Court refers to the 1956 notice as part of "corrective administrative action which has been taken," and as "relief voluntarily accorded [petitioner]." The premise upon which the dissenting opinion essentially rests—that the 1956 action was an attempt "to discharge Vitarelli retroactively"—thus is contrary to the Secretary's own position as to the reason for that action.

employment is based on a defined procedure, even though generous beyond the requirements that bind such agency, that procedure must be scrupulously observed. See *Service* v. *Dulles,* 354 U. S. 363. This judicially evolved rule of administrative law is now firmly established and, if I may add, rightly so. He that takes the procedural sword shall perish with that sword. Therefore, I unreservedly join in the Court's main conclusion, that the attempted dismissal of Vitarelli in September 1954 was abortive and of no validity because the procedure under Department of the Interior Order No. 2738 was invoked but not observed.

But when an executive agency draws on the freedom that the law vests in it, the judiciary cannot deny or curtail such freedom. The Secretary of the Interior concededly had untrammelled right to dismiss Vitarelli out of hand, since he had no protected employment rights. He could do so as freely as a private employer who is not bound by procedural restrictions of a collective bargaining contract. The Secretary was under no law-imposed or self-imposed restriction in discharging an employee in Vitarelli's position without statement of reasons and without a hearing. And so the question is, did the Secretary take action, after the abortive discharge in 1954, dismissing Vitarelli?

In October 1956 there was served upon Vitarelli a copy of a new notice of dismissal which had been inserted in the Department's personnel records in place of the first notice. Another copy was filed with the District Court in this proceeding. This second notice contained no mention of grounds of discharge. If, instead of sending this second notice to Vitarelli, the Secretary had telephoned Vitarelli to convey the contents of the second notice, he would have said: "I note that you are contesting the validity of the dismissal. I want to make this very clear to you. If I did not succeed in dismissing you before,

I now dismiss you, and I dismiss you retroactively, effective September 1954."

The Court disallows this significance to the second notice of discharge because it finds controlling meaning in the suggestion of the Government that the expunging from the record of any adverse comment, and the second notice of discharge, signified a reassertion of the effectiveness of the first attempt at dismissal. And so, the Court concludes, no intention of severance from service in 1956 could legally be found since the Secretary expressed no doubt that the first dismissal had been effective. But this document of 1956 was not a mere piece of paper in a dialectic. The paper was a record of a process, a manifestation of purpose and action. The intendment of the second notice, to be sure, was to discharge Vitarelli retroactively, resting this attempted dismissal on valid authority—the summary power to dismiss without reason. Though the second notice could not pre-date the summary discharge because the Secretary rested his 1954 discharge on an unsustainable ground, and Vitarelli could not be deprived of rights accrued during two years of unlawful discharge, the prior wrongful action did not deprive the Secretary of the power in him to fire Vitarelli prospectively. And if the intent of the Secretary be manifested in fact by what he did, however that intent be expressed—here, the intent to be rid of Vitarelli—the Court should not frustrate the Secretary's rightful exercise of this power as of October 1956. The fact that he wished to accomplish more does not mean he accomplished nothing.

To construe the second notice to mean administratively nothing is to attribute to the Secretary the purpose of a mere diarist, the corrector of entries in the Department's archives. This wholly disregards the actualities in the conduct of a Department concerned with terminating the services of an undesired employee as completely and by

whatever means that may legally be accomplished. If an employer summons before him an employee over whom he has unfettered power of dismissal and says to him: "You are no longer employed here because I fired you last week," can one reasonably escape the conclusion that though the employer was in error and had not effectively carried out his purpose to fire the employee last week, the employer's statement clearly manifests a present belief that the employee is dismissed and an intention that he be foreverafter dismissed? Certainly the employee would have no doubt his employment was now at an end. Of course if some special formal document were required to bring about a severance of a relationship, cf. *Felter* v. *Southern Pacific Co.*, 359 U. S. 326, because of non-compliance with the formality the severance would not come into being. But no such formality was requisite to Vitarelli's dismissal.

This is the common sense of it: In 1956 the Secretary said to Vitarelli: "This document tells you without any ifs, ands, or buts, you have been fired right along and of course that means you are not presently employed by this Department." Since he had not been fired successfully in 1954, the Court concludes he must still be employed. I cannot join in an unreal interpretation which attributes to governmental action the empty meaning of confetti throwing.