**John C. CARR, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 323–84C.

United States Claims Court.

June 16, 1988.

As Amended June 21, 1988.

John C. Carr, Brookline, Mass., pro se.

Stephen J. McHale, with whom were Asst. Atty. Gen. John R. Bolton, David M. Cohen, and Robert A. Reutershan, Washington, D.C., for defendant.

## OPINION

BRUGGINK, Judge.

Plaintiff John C. Carr seeks review of his suspension and discharge by the Nuclear Regulatory Commission ("NRC"). Both actions were taken pursuant to 5 U.S.C.

§ 7532 (1982), which authorizes the head of an agency to suspend or remove an employee when he considers such action necessary in the interests of national security.[1] Plaintiff has filed a motion for judgment on the pleadings; defendant has filed a motion for summary judgment that both addresses the merits and challenges this court's jurisdiction to hear Carr's claim that he was improperly suspended and discharged.

## FACTUAL BACKGROUND

The material facts are not in dispute. From September 1979 until his suspension on January 28, 1983, Carr held the position of Chief, Freedom of Information and Privacy Acts Branch, Division of Rules and Records. He supervised employees who prepared responses to all requests for NRC documents under the Freedom Of Information and Privacy Acts ("FOIA/PA"). All responses, together with documents to be released or withheld, were reviewed by Carr prior to their release.

The FOIA/PA branch log establishes that during Carr's tenure, approximately 800 to 900 classified documents passed through the branch. Copies of all withheld records, including classified documents, were retained in the FOIA/PA branch for long periods. The classified documents were maintained in two combination safes,

---

1. Section 7532 relates to suspensions and removals based on national security concerns:

§ 7532. Suspension and removal

(a) Notwithstanding other statutes, the head of an agency may suspend without pay an employee of his agency when he considers that action necessary in the interests of national security. To the extent that the head of the agency determines that the interests of national security permit, the suspended employee shall be notified of the reasons for the suspension. Within 30 days after the notification, the suspended employee is entitled to submit to the official designated by the head of the agency statements or affidavits to show why he should be restored to duty.

(b) Subject to subsection (c) of this section, the head of an agency may remove an employee suspended under subsection (a) of this section when, after such investigation and review as he considers necessary, he determines that removal is necessary or advisable in the interests of national security. *The determination of the head of the agency is final.*

(c) An employee suspended under subsection (a) of this section ... is entitled, after suspension and before removal, to—

(A) a written statement of the charges against him within 30 days after suspension, which may be amended within 30 days thereafter and which shall be stated as specifically as security considerations permit;

(B) an opportunity within 30 days thereafter, plus an additional 30 days if the charges are amended, to answer the charges and submit affidavits;

(C) a hearing, at the request of the employee, by an agency authority duly constituted for this purpose;

(D) a review of his case by the head of the agency or his designee, before a decision adverse to the employee is made final; and

(E) a written statement of the decision of the head of the agency.

(emphasis added).

to which Carr, as branch supervisor, had unlimited access. Carr was required to maintain a "Top Secret/Q Level" security clearance as a condition of his employment at the NRC. His position was classified as "critical-sensitive."

Carr is a licensed attorney in the State of Virginia, and was permitted to maintain a small private practice in addition to his employment at the NRC. During the period between October 1980 and October 1981, he had as clients three women who were charged with prostitution or attempted prostitution. All three pleaded guilty. Carr's services were paid for by George Glenn, who operated two escort services in the District of Columbia and who claimed to employ the women. In addition to representing the women in the charges against them, Carr counseled Glenn on how he should respond to customer questions regarding the nature of Glenn's services and how he should conduct himself in the event that Glenn was raided by police.

Glenn's escort service relied heavily upon credit card charges. In early 1981, however, Glenn was no longer able to clear the charges· directly through his bank. Carr arranged to have the charge slips passed through a pharmacy in Mechanicsville, Maryland. Glenn was later charged with and pleaded guilty to prostitution-related criminal offenses in November 1982.

On January 27, 1983, Carr was indicted on charges of interstate transportation in aid of racketeering in violation of 18 U.S.C. § 1952 (1982). On January 28, 1983, the NRC's Executive Director for Operations ("EDO"), William J. Dirks, informed Carr by letter that pursuant to 5 U.S.C. § 7532, he was immediately suspended without pay from his position.[2] In a subsequent letter dated February 25, 1983, Dirks disclosed two specific reasons for the suspension: (1) The information outlined in the 52–count indictment, and (2) Carr's "involvement with foreign officials." The second charge was subsequently dropped.

After a jury trial in May 1983, Carr was acquitted. He was not reinstated, however. Instead, the NRC proceeded to remove Carr pursuant to section 7532. Carr received a letter dated August 12, 1983 from the EDO, stating why the NRC decided to proceed against him. The letter said that Carr had:

> engaged in conduct which tends to show that you are not reliable or trustworthy and that you exercise poor judgment, and ... you may be subject to coercion, influence, or pressures which may cause you to act contrary to the national security.

The agency further specified four examples of such conduct:

a. Establishing and maintaining an ongoing business association with an outcall message and escort service which you knew or should have known was engaged in prostitution.

b. Counseling the operator of that service on how to conduct certain aspects of the business so that it did not appear to violate the law.

c. Conceiving, implementing, and operating a scheme whereby credit card slips obtained by the outcall service from its customers were processed through a third party business, in order to circumvent the fact that the outcall service had been suspended by credit card banking services from accepting credit card charge slips, and which you knew or should have known was a subterfuge of the policies of the credit card banking services.

d. Conducting business on behalf of the outcall service on official time by absenting yourself from your duties without permission and without taking leave, and/or by abuse of the leave regulations.

Carr requested and was granted a hearing on these charges before an administrative law judge ("ALJ"). This was the first such hearing ever held by the NRC. The agency promulgated rules to govern the

---

**2.** Pursuant to statute and Reorganization Plan No. 1 of 1980, the EDO functions as the agency head with respect to staff matters. 42 U.S.C. § 5849 (1982); Reorg. Plan No. 1 of 1980, § 2(b), 45 Fed.Reg. 40,561, *reprinted in* 42 U.S.C. § 5841 note (1982).

proceedings and provided them to Carr in advance of the hearing. Carr was represented by counsel.

At the outset of the hearing, the ALJ stated:

> The action ... is one taken by the Agency and I would assume it would be more appropriate for the Agency to proceed with the evidence on which their action is based, leaving it to Mr. Carr to meet such evidence and adduce such additional evidence as he has. Accordingly, I look to [Government counsel] to proceed.

Agency counsel then sought to introduce the entire transcript of Carr's criminal trial into evidence. Carr's counsel agreed. Plaintiff was then called by the agency to testify. He answered a number of questions, many by reading from the criminal trial transcript. He invoked his fifth amendment right against self-incrimination with respect to certain additional questions, however. His counsel then announced that Carr would no longer remain on the stand to testify, despite the fact that the Government was not through with questioning. At that point the agency proceeded to call a number of other witnesses. Carr did not put on any live testimony in his behalf during the hearing but relied instead on documents, including an affidavit of his own filed with his post-hearing brief.

Before the termination of the hearing, Carr was served with a new charge that he had "refused, without satisfactory explanation, to answer questions before a Federal administrative body regarding charges relevant to your continued eligibility for access authorization and/or employment clearance." He was afforded an opportunity to respond in writing to the additional charge after the hearing.

On February 15, 1984, the ALJ issued a decision recommending that Carr be removed from his position. Specifically, he found that Carr knew or should have known that he was aiding and abetting an illegal prostitution ring when he processed the credit card receipts for Glenn, that the involvement of employees "in criminal, shady or disreputable enterprises [makes] them subject to blackmail or other types of pressure," and that Mr. Carr had failed to demonstrate credibility, reliability, and trustworthiness by refusing to answer questions concerning his activities.

On May 7, 1984, the EDO adopted the ALJ's findings and conclusions in a written decision. He also added the following findings:

1. Your position ... is a sensitive national security position....

2. You knowingly and intentionally refused to answer questions from a Federal administrative body responsible under 5 U.S.C. 7532 for investigating the charges relevant to your continued eligibility for employment by the NRC....

3. You willingly became involved with an enterprise that you knew or should have known was engaged in prostitution, you established and operated a scheme that was the very life blood of that enterprise, and you circumvented the policies of the banking industry, all for personal gain.

He notified Carr that he would be removed from his position effective May 11, 1984.

On June 22, 1984, plaintiff filed this action claiming that the suspension and subsequent discharge were illegal, and seeking back pay and other relief. After briefing of the parties' dispositive motions, the action was suspended at the defendant's request and with plaintiff's concurrence, to await the outcome of two cases then pending before the Supreme Court. Those cases have been decided; the parties have briefed their significance, and the action is ready for disposition.

After reviewing the facts in the light most favorable to plaintiff and applying recent case law development, the court concludes that it has limited jurisdiction over this dispute but that summary judgment should be entered for defendant, and that plaintiff's motion for judgment on the pleadings should be denied.

## DISCUSSION

### A. Jurisdiction

The defendant's approach to the jurisdiction question has, of necessity, evolved

somewhat as the case law has changed during the pendency of this action. *See Egan v. Department of the Navy,* 802 F.2d 1563 (Fed.Cir.1986), *rev'd,* — U.S. —, 108 S.Ct. 818, 98 L.Ed.2d 918 (1988); *Fausto v. United States,* 783 F.2d 1020 (Fed. Cir.), *reh'g granted in part,* 791 F.2d 1554 (Fed.Cir.1986), *rev'd,* — U.S. —, 108 S.Ct. 668, 98 L.Ed.2d 830 (1988); *Lindahl v. Office of Personnel Management,* 718 F.2d 391 (Fed.Cir.1983), *rev'd,* 470 U.S. 768, 105 S.Ct. 1620, 84 L.Ed.2d 674 (1985).[3] In its opening brief, the Government conceded that prior to passage of the Civil Service Reform Act of 1978, Pub.L. No. 95–454, 92 Stat. 1111 ("CSRA"), a limited review of dismissals under section 7532 was available to ensure that the employee discharged was in a sensitive position and had been afforded procedural rights. *See Vitarelli v. Seaton,* 359 U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959); *Cole v. Young,* 351 U.S. 536, 76 S.Ct. 861, 100 L.Ed. 1396 (1956). Utilizing the same analysis ultimately adopted by the Supreme Court in *Fausto,* defendant argued that the comprehensiveness of the CSRA means that there is no longer a remedy in this court to award back pay for improper discharges of civilian employees. According to defendant, such remedies were impliedly repealed, not only for employees given protection by the CSRA, but also for those who were not. Defendant now points to the Supreme Court's decision in *Fausto* as further support for its contention. Before considering the effect of *Fausto,* the court considers it necessary to review briefly the sources of this court's and our predecessor court's jurisdiction prior to adoption of the CSRA.

This court is granted jurisdiction by 28 U.S.C. § 1491(a)(1) (1982) ("the Tucker Act") to hear claims against the Government based, among other things, on an act of Congress. The Tucker Act itself does not confer a substantive right of recovery.

Such a right must be grounded in a contract, a statute, or a regulation. *United States v. Connolly,* 716 F.2d 882, 885 (Fed Cir.1983), *cert. denied,* 465 U.S. 1065, 104 S.Ct. 1414, 79 L.Ed.2d 740 (1984). Assuming for the sake of argument that the CSRA is not a factor in this case, Carr's substantive right to sue arises from the Back Pay Act[4] and the right to maintenance of a salary created by certain pay and organizational statutes relevant to the NRC.

When the Atomic Energy Commission ("AEC" or "Commission") was abolished, 42 U.S.C. § 5814 (1982), certain of its functions and powers were transferred to Carr's employer, the NRC. *Id.* § 5841(f). Among those were powers related to employment of personnel. *Id.* § 2201(d). The Commission had the power to "appoint and fix the compensation of such officers and employees as may be necessary." *Id.* Noteworthy is the provision that such employees "shall be appointed in accordance with the civil-service laws and their compensation fixed in accordance with chapter 51 and subchapter III of chapter 53 of Title 5." *Id.* The latter references include 5 U.S.C. § 5332(a), which creates certain rights to continuation of salary for employees such as Carr: "Each employee to whom this subchapter applies ... is entitled to basic pay in accordance with the General Schedule." Carr's salary can thus be traced to the authority and implied rights of section 5332(a). Accordingly, if he was not properly removed from his position with the NRC, Carr is entitled to his salary. *See Service v. Dulles,* 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957); *Greenway v. United States,* 163 Ct.Cl. 72, 76 (1963); *Starzec v. United States,* 145 Ct.Cl. 25 (1959); *Newman v. United States,* 143 Ct.Cl. 784, 794 (1958); *Adler v. United States,* 129 Ct.Cl. 150 (1954);[5] *cf. Ridens v.*

3. In its original brief, defendant placed much reliance on the decision in *Lindahl,* in which the Federal Circuit held that there was no judicial review of Office of Personnel Management ("OPM") decisions in voluntary disability retirement cases. 718 F.2d at 400. In reversing, the Supreme Court held that a limited nonfactual review was not precluded by 5 U.S.C. § 8347(c).

(1982). 470 U.S. at 791, 105 S.Ct. at 1633; *see infra* p. 88.

4. 5 U.S.C. § 5596 (1982). *See Hambsch v. United States,* 848 F.2d 1228 (Fed.Cir.1988).

5. The court does not, however, accept plaintiff's argument that jurisdiction can be premised under the Administrative Procedure Act, 5 U.S.C.

*Nuclear Regulatory Comm'n,* 4 MSPB 515, 4 M.S.P.R. 566 (M.S.P.B.1980); U.S. Civil Serv. Comm'n, 93d Cong., 1st Sess., *Statutory Exceptions to the Competitive Service, A Report to the Committee on Post Office and Civil Service of the United States Senate* 60–65 (Comm. Print 1973). Moreover, it is clear that our predecessor court reviewed claims brought by employees discharged under the predecessor to section 7532.[6] *Leiner v. United States,* 143 Ct.Cl. 806, 181 F.Supp. 400 (1958); *Karpoff v. United States,* 142 Ct.Cl. 93 (1958); *cf. Day v. United States,* 143 Ct.Cl. 311 (1958) (holding that national security-based discharge protections did not apply to plaintiff's removal); *Weinstein v. United States,* 109 Ct.Cl. 579, 74 F.Supp. 554 (1947) (discharge pursuant to Act of June 28, 1940, Pub.L. No. 76–671, § 6, 54 Stat. 676, 679).

■ Consequently, the question before the court is whether, in view of the court's otherwise-inherited jurisdiction over civilian pay claims, the CSRA, as construed in *Fausto,* precludes review in the case of a preference-eligible employee in the excepted service[7] who is discharged pursuant to section 7532. The court concludes that it does not.

In *Fausto,* the Court held that the intent and effect of the CSRA was sufficiently comprehensive such that employees implicitly considered by Congress but not given protection by the Act were no longer entitled to pursue back pay claims in this court:

The comprehensive nature of the CSRA, the attention that it gives throughout to the rights of nonpreference excepted service employees, and the fact that it does not include them in provisions for administrative and judicial review contained in Chapter 75, combine to establish a congressional judgment that those employees should not be able to demand judicial review *for the type of personnel action covered by that chapter.*

108 S. Ct. at 673 (emphasis added).

The premise of the analysis in *Fausto* is that the CSRA was intended as a substitute for previous remedies for improper discharge of civilian employees. In analyzing the extent of the intended substitution of remedies, the Court points to the fact that Congress addressed preference-eligible excepted service employees and gave them certain rights in the event of an adverse action. From this the Court concluded that Congress was obviously aware of nonveteran's-preference-eligible employees and consciously chose not to extend the same remedies to them. The Court specifically relies upon "two structural elements" of the CSRA that it believes would be undercut in permitting judicial review of *Fausto's* claim: the preferred position of certain categories of employees—competitive service employees and veterans—and the primacy of the Merit Systems Protection Board ("MSPB") for administrative resolution of disputes over adverse actions. 108 S.Ct. at 674. A brief comparison of removals pursuant to the CSRA with those under section 7532 demonstrates why the two structural elements with which *Fausto* was concerned are not a factor here.

Carr was not removed under 5 U.S.C. § 7513.[8] He was removed under section

§§ 551–706 (1982) ("APA"). The APA does not confer jurisdiction on a court not already possessing it. *National Corn Growers Ass'n v. Baker,* 840 F.2d 1547, 1559 (Fed.Cir.1988); *American Air Parcel Forwarding Co. v. United States,* 718 F.2d 1546, 1552 (Fed.Cir.1983) (citing *Califano v. Sanders,* 430 U.S. 99, 104–07, 97 S.Ct. 980, 983–85, 51 L.Ed.2d 192 (1977)), *cert. denied,* 466 U.S. 937, 104 S.Ct. 1909, 80 L.Ed.2d 458 (1984).

6. *See infra* note 10 and accompanying text.

7. The record is unclear as to plaintiff's precise employment status. Carr refers to himself in briefing, however, without contradiction from

defendant, as a veteran's-preference-eligible excepted service employee. The record does not otherwise contradict this assertion. It is clear in any event that Carr is a veteran. For purposes of the analysis herein, the court assumes Carr is entitled to protections of the Veterans' Preference Act of 1944, Pub.L. No. 78–359, § 14, 58 Stat. 387, 390.

For the definitions of "preference eligible" and "excepted service," see *Fausto,* 108 S.Ct. at 670 n. 1.

8. Carr could have been removed under this section. But if the agency had taken action under section 7513, Carr would have had a right of appeal to the MSPB as a nonprobationary pref-

7532, which, while a part of chapter 75, was not a part of the CSRA. Section 7532 was adopted in its present form in 1966, Pub.L. No. 89–554, 80 Stat. 529, although, as discussed below, a predecessor statute was enacted in 1950. Indeed, as defendant itself concedes, "In undertaking its review and reform of the civil service laws, Congress considered section 7532 and expressly excluded suspensions and removals under that section from the CSRA's scheme of administrative and judicial review," citing S.Rep. No. 969, 95th Cong., 2d Sess. 47, 50, *reprinted in* 1978 U.S.Code Cong. & Admin.News 2723, 2769, 2772. Section 7512 specifically provides that subchapter II of the CSRA, which includes suspension and removal for cause provisions, does not apply to "a suspension or removal under section 7532 of this title." 5 U.S.C. § 7512(A); *see also* 5 U.S.C. § 7502 ("This subchapter ... does not apply to a suspension under section ... 7532....").[9]

As the Court subsequently made clear in *Egan,* 108 S.Ct. 818, section 7532 is an independent and alternative procedural device available to the agency. In that case, the Supreme Court held that the MSPB correctly declined, in an action brought pursuant to 5 U.S.C. § 7513, to examine the merits of a security clearance denial, even though that denial was the ground for the employee's discharge. In reaching that result, the Court spoke to the procedure created by section 7532. It affirmed the MSPB's conclusion that national security-based discharges can be taken pursuant to either section 7513 or section 7532: "[T]he statutes provide a 'two-track' system." 108 S.Ct. at 823.

The application of section 7532 is not limited to only certain types of employees. There is no bar to its application, for example, to employees possessing adverse action appeal rights under the CSRA. The rights such an employee might otherwise have

under the CSRA become irrelevant if the agency head invokes the national security as the reason for suspension or removal. The first structural element that the *Fausto* Court was concerned with—preserving preferences for certain types of employees —is thus not implicated.

Nor is the second element—the desire to give primacy to the MSPB—implicated. The discussion in *Egan* emphasizes that removals under section 7532 are structurally independent of actions over which the MSPB exercises review. 108 S.Ct. at 823. Accordingly, there is no conflict.

The underlying premise in *Fausto* thus is not present here. The court concludes that neither the CSRA nor the *Fausto* decision suggests that Congress intended the employee appeal reforms of 1978 to preempt any preexisting remedies under section 7532, particularly when there had traditionally been a limited judicial review. By arguing that the CSRA ousts this court of any lingering jurisdiction it might have in reviewing discharges taken pursuant to section 7532, defendant is urging both that the plaintiff cannot utilize the protections of the CSRA as a shield, and that the Government can use the Act as a sword to deprive an employee of any court review under section 7532. That result is untenable, and not required by *Fausto.*

This conclusion is supported by the Supreme Court's analysis in *Lindahl,* 470 U.S. 768, 105 S.Ct. 1620. That action raised the question of whether a determination by OPM pursuant to 5 U.S.C. § 8347(c) that an employee was not disabled was reviewable in the Court of Appeals for the Federal Circuit. The Federal Circuit had dismissed Lindahl's appeal from the MSPB affirmance of OPM's denial of his claim. 718 F.2d 391 (Fed.Cir.1983). The court held that review beyond the MSPB was unavailable, particularly in view of the lan-

erence-eligible excepted service employee under 5 U.S.C. §§ 2108(3), 7511(a)(1)(B), and 7513. That decision would have been appealable only to the Federal Circuit.

**9.** The recent decision of the court of appeals in *Hambsch v. United States,* 848 F.2d 1228 (Fed. Cir.1988), is not to the contrary. That case

involved a challenge to a refusal to grant administrative leave. The opinion rejected plaintiff's argument that jurisdiction existed, not based on *Fausto,* but on the fact that there had never been jurisdiction in the Court of Claims to hear such cases; there was no statutory entitlement to a present claim of back pay for refusal to grant the contested leave.

guage in section 8347(c) that decisions of OPM "are final and conclusive and are not subject to review." The Supreme Court reversed, finding that a limited appellate review of nonfactual matters was available. Although much of the Court's reasoning was based on the legislative history of 1980 amendments to section 8347, a number of more general principles and points of similarity with this case emerge: first, the general presumption favoring judicial review, 470 U.S. at 778, 105 S.Ct. at 1626; second, the fact that the statutory language being reviewed contained a statement susceptible to making the administrative decision final; third, the fact that Congress can, when it wishes, make it very clear that no judicial review is available, *id.* at 780 n. 13, 105 S.Ct. at 1627 n. 13; and finally, the fact that Congress was aware of previous judicial decisions finding that a limited review was available, yet did not specifically reverse them in 1980. All four of these factors are applicable in the present action. The final one, in particular, bears emphasis because section 7532 was enacted in its present form in 1966, well after the *Cole* and *Vitarelli* decisions had concluded that limited judicial review was available under the Act of 1950.

Defendant also argues that the Supreme Court's recent ruling in *Egan* prevents the court from asserting jurisdiction. Egan was a veteran's-preference-eligible civilian employee of the Navy. Although he was given a position working on a nuclear submarine, retention of his position was conditioned on satisfactory completion of a security investigation. When Egan was unable to get a security clearance, he was discharged pursuant to section 7513. He appealed his discharge to the MSPB. In its decision, the Court held that the MSPB did not have jurisdiction to review the merits of the agency's decision to deny a security clearance.

Defendant uses *Egan* in two ways to support its argument that judicial review is no longer available to persons discharged under section 7532. First, it contends that *Egan* affirms the need for courts to show great deference to decisions by the executive branch in matters of foreign policy and national security. Defendant's admonition is well-taken, but, as discussed herein, not to the extent defendant wishes.

Second, defendant attempts to use *Egan* in a more affirmative way to block review. It points to language in the decision that highlights the limitations of section 7532 procedures, and that suggests no judicial review is contemplated: "[Egan] would not have been entitled to any review outside the agency.... In short, § 7532 ... provides a procedure that is harsh and drastic both for the employee and for the agency head, who must act personally in suspending and removing the employee." 108 S.Ct. at 827.

The court is unwilling to read this statement as broadly as defendant suggests. The nature and extent of the procedures and judicial review available under section 7532 were not before the Court. The adverse action there was taken pursuant to section 7513. The precise issue before this court was thus not present in *Egan*. Moreover, the court would be reluctant to assume, in the absence of a more expanded and explicit discussion, that the Supreme Court had revisited and casually reversed its own precedent clearly holding that there is limited judicial review available in an action taken pursuant to section 7532. Indeed, the *Egan* court quotes from one of these decisions, *Cole v. Young*, 351 U.S. 536, 546, 76 S.Ct. 861, 868, 100 L.Ed. 1396 (1956). 108 S.Ct. at 825. In *Cole*, the Court construed a predecessor provision of present section 7532, Act of Aug. 26, 1950, Pub.L. No. 81–733, ch. 803, 64 Stat. 476 ("The Act of 1950").[10] That provision gave heads of certain agencies summary suspension and unreviewable dismissal powers, and authorized the President to designate additional agencies that would be given such powers. By executive order, Presi-

---

**10.** The Act of 1950, in turn, appears to have been modeled after the Act of June 28, 1940, Pub.L. No. 76–671, § 6, 54 Stat. 676, 679, which permitted summary dismissal on national security grounds of civilian employees during World War II. *See Weinstein v. United States,* 109 Ct.Cl. 579, 583–84, 74 F.Supp. 554, 555–56 (1947).

dent Eisenhower extended the Act to include "all other departments and agencies of the Government." Exec. Order No. 10,-450, § 1, 18 Fed.Reg. 2489 (1953). The executive order did not require any determination that the discharged employee was in a security-sensitive position.

Cole was a preference-eligible veteran, and thus entitled to the protection of the Veterans' Preference Act of 1944, Pub.L. No. 78–359, § 14, 58 Stat. 387, 390. He was employed as a food and drug inspector by the Department of Health, Education, and Welfare. After reviewing the legislative history surrounding the Act of 1950, the Court concluded that not all positions in Government are affected with national security, and that the statute was intended to apply only to those that were. 351 U.S. at 549–50, 76 S.Ct. at 869–70. Because no effort was made to draw a connection to national security in Cole's case, the Court found that his discharge was not consistent with the Act of 1950. The Court thus held that the executive order, which purported only to implement that statute, went too far. Cole's discharge was therefore voided based on his rights as a preference-eligible employee.

The lesson this court draws from *Cole* is that a discharge under present section 7532 can be challenged in court on the limited ground that the agency head did not make a determination that the position occupied by the employee was affected with the national security.

Another aspect of limited judicial review that the court believes was preserved after *Fausto* and *Egan* is the determination of whether the procedural protections afforded by the statute or the agency's own regulations were in fact afforded. This type review was first articulated in *Vitarelli v. Seaton*, 359 U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959). Petitioner there was a "Schedule A" employee of the Department of the Interior, with no protection under civil service laws from summary discharge. He was fired for cause under the Act of 1950 because of his association with communist sympathizers. Vitarelli's position had not been designated "sensitive," and thus his discharge was probably defective under *Cole*, which was decided after his discharge but before the Court's decision. The agency offered to expunge the record and simply discharge Vitarelli without any statement of cause, as it had a right to do with any Schedule A nonpreference-eligible employee. The Court declined the agency's suggestion, however. Without reaching any constitutional issue,[11] it found that the discharge had not been executed in full conformity with the Department of the Interior's own internal procedures for national security discharges. "Since, however, the Secretary gratuitously decided to give a reason, and that reason was national security, he was obligated to conform to the procedural standards he had formulated in Order No. 2738 for the dismissal of employees on security grounds." 359 U.S. at 539, 79 S.Ct. at 972. Specifically, three deficiencies were found: (1) the statement of charges was not sufficiently specific; (2) restrictions on relevancy, competency, and materiality were not observed; and (3) nonconfidential sources supporting the agency's charges were not made available for cross-examination.

More recently, the Court of Appeals for the District of Columbia in *Doe v. Weinberger*, 820 F.2d 1275 (D.C.Cir.1987), *cert. granted sub nom. Carlucci v. Doe*, — U.S. ——, 108 S.Ct. 1073, 99 L.Ed.2d 233 (1988), held that section 7532 "does not preclude judicial review to the extent necessary to ensure that the Secretary, in fact, acts pursuant to the statute, including its procedural requirements." *Id.* at 1279 (citing *Cole v. Young*, 351 U.S. 536, 76 S.Ct. 861, 100 L.Ed. 1396 (1956)).

Finally, the court notes that the Supreme Court's recent decision in *Webster v. Doe*, — U.S. ——, 108 S.Ct. 2047, 100 L.Ed.2d 632 (1988), supports the conclusion that judicial review can be available despite national security overtones and a statute that arguably gives unreviewable discharge discretion to the agency head. In that case,

---

**11.** Vitarelli questioned the constitutionality of an administrative discharge proceeding based on confidential information not disclosed to him.

Doe was a covert electronics technician employed with the Central Intelligence Agency ("CIA"). The Director of the CIA discharged Doe pursuant to section 102(c) of the National Security Act of 1947, 50 U.S.C. § 403(c) (1982), after Doe voluntarily disclosed that he was a homosexual. That section provides that the Director may, in his discretion, terminate the employment of any CIA employee "whenever he shall deem such termination necessary or advisable in the interests of the United States." Doe was given no administrative appeal rights. Although the Court held that judicial review of the termination was not available under the APA, Doe's claims of constitutional violations [12] were reviewable. It concluded that in view of a heavy presumption against construing a federal statute to deny a forum for reviewing constitutional claims, section 102(c) was not written in such a way as to preclude all review. Although that ruling is not directly relevant with respect to Carr, who does not squarely raise constitutional claims,[13] it does suggest that a statute similar in purpose and wording to section 102(c), namely section 7532, is likewise not preclusive of review.

The court notes, however, that in *Doe* the Supreme Court agreed with the Government that the "discharged employee thus cannot complain that his termination was not 'necessary or advisable in the interests of the United States,' since that assessment is the Director's alone." *Doe*, at —, 108 S.Ct. at 2054. On remand, the district court could only consider the constitutional claims.[14]

It is noteworthy in this connection that *Egan* specifically held only that the MSPB could not inquire into the merits of the security clearance denial. Left intact was the Board's assertion of a limited review:

[T]he Board will review the procedures utilized by the agency to ensure that the agency afforded the appellant procedural due process. We further hold that the minimal due process rights that must be afforded the employee upon the agency's denial or revocation of a security clearance are: notice of the denial or revocation; a statement of the reason(s) upon which the negative decision was based; and an opportunity to respond.

28 M.S.P.R. 509, 519 (1985), *rev'd,* 802 F.2d 1563 (Fed.Cir.1986), *rev'd,* — U.S. —, 108 S.Ct. 818, 98 L.Ed.2d 918 (1988).

The court concludes that neither the passage of the CSRA nor the Supreme Court's decisions in *Fausto* and *Egan* preclude judicial review in this case to make the following limited determinations:

(1) whether there was a determination that plaintiff's position was sensitive from a national security standpoint; and

(2) whether plaintiff's suspension and removal complied with procedures mandated by statute and regulation.

### B. Merits

#### 1. *Designation of Carr's Position*

█ In light of *Cole*, invocation of section 7532 required a determination by the agency that Carr occupied a position affected by the national security. *Cole*, 351 U.S. at 543, 76 S.Ct. at 866. Carr's argument is that neither the agency in general nor his position in particular genuinely affect the national security.[15]

The Act of 1950 specifically enumerated eleven agencies that could utilize that discharge provision. Most of those agencies were directly involved with the national defense, although some, like the AEC, were not. The revision that resulted in section 7532 in its present form extends that dis-

---

**12.** In addition to his other claims, Doe argued that his discharge deprived him of property, liberty, and privacy rights in violation of the first, fourth, fifth and ninth amendments, as well as his rights to due process and equal protection.

**13.** *But see infra* note 17.

**14.** Doe's claims of violation of agency regulations, although subject to review under the APA, had been rejected below and were not revisited by the Supreme Court. *See Doe*, at —— - —— n. 8, 108 S.Ct. at —— —— n. 8.

**15.** Plaintiff also contends that no actual breach of security was demonstrated. Defendant correctly points out that none was alleged and none need be established.

charge authority to any agency head, but requires a finding that the removal is necessitated by national security interests. While Carr invites the court to examine whether such authority should ever have been given to non-defense agencies such as the NRC, the court declines to do so. Congress clearly had the authority to adopt section 7532, and the sole question is whether there was a determination that Carr's particular position was one involving the national security. There is no question that such a determination was made. The EDO specifically found that Carr's position "is a sensitive national security position." The court views that determination as not subject to court scrutiny. As the Supreme Court recently iterated in *Egan*, matters of national security are not suited to judicial review.[16] The Court there, in addressing a related issue, pointed out:

> Predictive judgment of this kind must be made by those with the necessary expertise in protecting classified information. For "reasons ... too obvious to call for enlarged discussion," *CIA v. Sims*, 471 U.S. 159, 170, 105 S.Ct. 1881, 1888, 85 L.Ed.2d 173 (1985), the protection of classified information must be committed to the broad discretion of the agency responsible, and this must include broad discretion to determine who may

have access to it. Certainly, it is not reasonably possible for an outside non-expert body to review the substance of such a judgment and to decide whether the agency should have been able to make the necessary affirmative prediction with confidence. Nor can such a body determine what constitutes an acceptable margin of error in assessing the potential risk. The Court accordingly has acknowledged that with respect to employees in sensitive positions "there is a reasonable basis for the view that an agency head who must bear the responsibility for the protection of classified information committed to his custody should have the final say in deciding whether to repose his trust in an employee who has access to such information." *Cole v. Young*, 351 U.S. 536, 546, 76 S.Ct. 861, 868, 100 L.Ed. 1396 (1956).

*Egan*, 108 S.Ct. at 825.

Even assuming that Carr's position designation is one that the court could review, however, there is ample support for it in this case. Carr was required to have a "Top Secret/Q Level" security clearance. He does not dispute that he routinely handled classified documents, that he had to make determinations concerning the release of information related to generation

---

**16.** Defendant appears to conclude that if review of the discharge determination is available, then the question before the court is whether the administrative decision was arbitrary, capricious, grossly erroneous, or without substantial evidentiary support. It cites in support general law relating to review of agency action. *E.g., Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938); *Power v. United States*, 209 Ct.Cl. 126, 129–30, 531 F.2d 505, 507 (1976); *Morelli v. United States*, 177 Ct.Cl. 848, 858 (1966). Having disagreed with defendant by concluding that review is available, the court nevertheless also holds that the review defendant describes is too broad. Those cases cited did not arise under § 7532, which severely limits review, and they predate *Egan*. Although some review is available, it is limited to the test set out herein, i.e., whether the agency designated the position as security-sensitive and whether procedural protections were afforded. A review as to substantiality of evidence, or arbitrariness, for example, would inevitably involve precisely the types of substantive matters that section 7532 appeared to take out of the courts.

Nevertheless, because the issue is not without ambiguity, and because the review prohibited in *Egan* only involved the security-clearance determination, out of an abundance of caution, the court notes that it has reviewed the entire record, including that of the criminal proceeding, and finds that the agency's decision to suspend and remove Carr was not arbitrary, capricious, or grossly erroneous, and that it was based upon substantial evidence. The fact that plaintiff was acquitted of criminal charges based on the same conduct does not aid him. The agency, in effect, put on Carr the burden of proving by clear and convincing evidence that he was not a security risk. At the criminal trial, the Government had the burden of proving beyond a reasonable doubt that he committed a crime. The acquittal thus is not conclusive of the question of whether Carr could prove he was not a security risk. *See Polcover v. Secretary of Treasury*, 477 F.2d 1223, 1231–32 (D.C. Cir.), *cert. denied*, 414 U.S. 1001, 94 S.Ct. 356, 38 L.Ed.2d 237 (1973).

of nuclear energy, and that his position was classified "critical-sensitive." Moreover, the court is unwilling to say that regulation of civilian nuclear reactors does not affect the national security. Indeed, the contrary seems true. Carr's discharge thus meets the test of *Cole.*

### 2. *Alleged Procedural Error*

█ Carr also contends that he was deprived of procedural rights during his removal. The court looks to two sources for those rights: section 7532 and the internal procedures adopted by the NRC to govern the discharge and hearing. Carr correctly contends that the agency is bound to adhere to those regulations. *See Vitarelli,* 359 U.S. at 539–40, 79 S.Ct. at 972–73.

Carr's first contention is that it was error for the agency to put the burden of proof on him to demonstrate the impropriety of the removal decision. Although the agency went first at the hearing, the ALJ, in reviewing the evidence, looked to Carr as having the burden of proof. He treated the issue as "whether respondent has clearly demonstrated that reinstating his access authorization and/or employment clearance and/or reinstatement of employment will not endanger the national security." This approach was consistent with the regulations developed by the NRC, which call on the ALJ to make a recommendation adverse to the employee if the employee has

not "clearly demonstrated" that the discharge would not endanger national security. Those regulations in turn are consistent with Carr's statutory source of procedural rights. Section 7532 creates a right to a hearing, but there is no suggestion of a presumption that the employee will not be discharged unless the agency carries its burden of proof. The statutory scheme envisions that the head of the agency first makes a determination to suspend the employee. The employee can respond to that determination "to show why he should be restored to duty." Thus, the burden of proof is placed on the employee at that point. If the agency head, after investigation, considers it necessary in the interests of national security, he or she may remove the suspended employee. That determination is "final," subject only to the procedures set out in the statute: a written statement of charges, an opportunity to answer, a hearing, a review by the agency head or designee, and a written decision. The procedures given in this case met those requirements. Carr was entitled to a hearing, and one was held.[17] Given the presumption that public officials act in good faith, *Boyle v. United States,* 207 Ct.Cl. 27, 34, 515 F.2d 1397, 1401 (1975), the court cannot assume that the ALJ and the EDO would have been unwilling to recommend or to implement a recommendation to set aside the proposed removal if Carr had clearly demonstrated a lack of danger to national security.

---

**17.** Although not explicitly argued, plaintiff suggests that the procedural requirements of § 7532 do not provide sufficient due process protection, and are thus unconstitutional. Plaintiff, a nonprobationary preference-eligible public employee, clearly had a property interest in his position and was entitled to due process protections prior to removal. *See Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 541, 105 S.Ct. 1487, 1492, 84 L.Ed.2d 494 (1985); *Christie v. United States,* 207 Ct.Cl. 333, 340, 518 F.2d 584, 588–89 (1975) (citing *Arnett v. Kennedy,* 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974)). The extent of the process he was due, however, depends in large measure on how Congress has defined his employment position and on the circumstances of removal. *See Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972) ("[T]he process is flexible and calls for such procedural protection as the particular situation demands."). In the case of a security-based removal, Congress has

chosen to rest in the agency head significant discretion in determining when to discharge employees in security-sensitive positions. In the circumstances of a facially valid invocation of § 7532, the court sees no violation of due process in requiring the employee to demonstrate his entitlement to a security clearance and to his position. *Cf. Egan,* 108 S.Ct. at 824, 826. As the Supreme Court stated in *Loudermill,* 470 U.S. at 546, 105 S.Ct. at 1495:

> The essential requirements of due process ... are notice and an opportunity to respond. The opportunity to present reasons, either in person or in writing, why proposed action should not be taken is a fundamental due process requirement.... The tenured public employee is entitled to oral and written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story.

Carr was clearly provided with all of these rights under § 7532.

Carr also raises as a defect the fact that he was separately charged with refusing, without explanation, to answer questions during the removal hearing. His challenge is not that he was given insufficient time to address the new charge—he was given additional time to do so. Rather, his argument is that he was, in effect, put in the position of proving the agency's case.

The Supreme Court has held that a public employee cannot be discharged simply for failing to waive his constitutional right against self-incrimination. *Gardner v. Broderick*, 392 U.S. 273, 88 S.Ct. 1913, 20 L.Ed.2d 1082 (1968). He or she can, however, be discharged for failure to answer questions specifically and directly related to performance of official duties. *Id.* at 278, 88 S.Ct. at 1916. Invocation of the privilege against self-incrimination in those circumstances is not a bar to dismissal. Carr was not given the type of Hobson's choice that confronted Gardner, however. Carr was not compelled to waive his right against self-incrimination. His counsel simply announced that Carr would answer no further questions at the hearing.

A case closely on point is *Clifford v. Shoultz*, 413 F.2d 868 (9th Cir.), *cert. denied sub nom. Shoultz v. Laird*, 396 U.S. 962, 90 S.Ct. 426, 24 L.Ed.2d 426 (1969). There, an employee of a private firm doing government work had his security clearance revoked for failure to answer questions in an inquiry into his continued eligibility for the clearance. In reversing the district court's injunction against revoking the security clearance, the court of appeals held that Shoultz had no right both to have the security clearance and to refuse to answer relevant questions.

Carr attempts to distinguish *Shoultz* on the ground that Government counsel did not actually proceed to pose questions to Carr after plaintiff announced he would not answer questions. The court views that as an immaterial difference. Carr's announced refusal went to all questions, not just those that might implicate his privilege against self-incrimination. Carr's attorney stated, "Mr. Carr, in all respect to these proceedings, sir, does not wish to answer

any more questions at this point." At that point Government counsel stated that he would still like to have Carr testify. Given the facts that previous questioning of Carr had been directed to relevant issues and that the ALJ showed an even-handedness in sustaining some of Carr's counsel's objections during the hearing, the court finds that the agency counsel's failure to pose specific questions does not create a meaningful distinction with *Shoultz.*

Nor is it a sufficient objection that the charge arose in connection with a hearing requested by Carr. Carr had to have a security clearance to maintain his job. His retention of that clearance, and thus his position, was not a matter of right. His refusal to answer questions relevant to his fitness to hold the security clearance thus becomes a logical basis for discharge regardless of whether the hearing was at the agency's insistence or Carr's.

### CONCLUSION

After considering the entire administrative record and each of plaintiff's contentions, the court concludes that no basis exists within this court's review powers on which to reverse the plaintiff's suspension or discharge. Plaintiff's motion for judgment on the pleadings is thus denied. Defendant's motion for summary judgment is granted insofar as it relates to the nonjurisdictional issues. The Clerk is directed to dismiss the complaint. No costs.