NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

---

**ROBERT M. HUDICK,**
*Claimant-Appellant*

**v.**

**ROBERT WILKIE, SECRETARY OF VETERANS AFFAIRS,**
*Respondent-Appellee*

---

2017-2234

---

Appeal from the United States Court of Appeals for Veterans Claims in No. 15-4161, Judge Coral Wong Pietsch, Judge Mary J. Schoelen, Senior Judge Alan G. Lance, Sr.

---

Decided: December 3, 2018

---

ZACHARY STOLZ, Chisholm Chisholm & Kilpatrick, Providence, RI, argued for claimant-appellant. Also represented by MEGAN MARIE ELLIS, APRIL DONAHOWER; BARBARA J. COOK, Barbara J. Cook, Attorney at Law, Cincinnati, OH; CHRISTOPHER J. CLAY, Disabled American Veterans, Cold Springs, KY.

NATHANAEL YALE, Commercial Litigation Branch,

Civil Division, United States Department of Justice, Washington, DC, argued for respondent-appellee. Also represented by ROBERT EDWARD KIRSCHMAN, JR., LOREN MISHA PREHEIM, JOSEPH H. HUNT; BRIAN D. GRIFFIN, BRANDON A. JONAS, Office of General Counsel, United States Department of Veterans Affairs, Washington, DC.

————————————

Before NEWMAN, CLEVENGER, and O'MALLEY, *Circuit Judges.*

O'MALLEY, *Circuit Judge.*

Robert M. Hudick appeals from the final decision of the United States Court of Appeals for Veterans Claims ("Veterans Court"), which affirmed a decision by the Board of Veterans' Appeals ("the Board") denying him an entitlement to service connection for his prostate cancer. *Hudick v. Snyder*, 2017 WL 444516, at *1 (Vet. App. Feb. 2, 2017). Because we conclude that the Board failed to apply its own internal procedures in adjudicating Hudick's claim and that this error was not harmless, we *reverse.*

## I. BACKGROUND

Hudick served in the United States Air Force from September 1962 until he was honorably discharged in July 1983. As relevant to this appeal, Hudick served at the Udorn Royal Thai Air Force Base in Thailand ("Udorn Air Force Base") from January 1967 to January 1968.

In April 2006, Hudick was diagnosed with prostate cancer. Hudick thereafter filed a claim for service connection regarding his prostate cancer with the Department of Veterans Affairs' ("VA") regional office in Fort Harrison, Montana ("the Regional Office"). This began the process, spanning many years and several appeals, outlined below.

## A. VA Regional Office Decision

Before the Regional Office, Hudick argued that his prostate cancer was connected to herbicide exposure in Vietnam. Hudick specifically explained that, although he was stationed at Udorn Air Force Base in Thailand, he regularly traveled to Tan Son Nhut Air Base in Vietnam for various assignments.

On July 10, 2006, the Regional Office sent a letter to Hudick and the National Personnel Records Center requesting records showing that Hudick had physically set foot in Vietnam while serving at Udorn Air Force Base in Thailand. The Regional Office did not receive a response from Hudick. The National Personnel Records Center, however, did respond. It explained that it was "unable to verify that [Hudick] had in-country service in the Republic of Vietnam." J.A. 21.

The Regional Office denied Hudick's claim on November 3, 2006. In its decision, the office explained that Hudick could not show a connection between his prostate cancer and his military service. While the office acknowledged that such a connection is presumed for veterans who served in Vietnam during the time frame Hudick alleged, it concluded that he was not entitled to this presumption because there was "no evidence" showing he was "ever in the country of Vietnam." J.A. 21. Without the presumption, the Regional Office found "no basis in the available evidence of record to establish service connection for [Hudick's] prostate cancer." J.A. 22.

Hudick appealed this decision to the Board.

## B. Intervening Compensation Bulletin

After Hudick appealed the Regional Office decision but before the Board ruled on his petition, the VA issued a new Compensation & Pension Service Bulletin. *See* Department of Veterans Affairs, Comp. & Pension Serv. Bull., Policy 211, *New Procedures for Claims Based on*

*Herbicide Exposure in Thailand and Korea* (May 2010)
("Compensation          Bulletin"),          available          at
https://tinyurl.com/CompensationBulletin (accessed Oct.
22, 2018).   In the Compensation Bulletin, the VA
acknowledged that, between February 28, 1961 and May
7, 1975—while Hudick served in Thailand—"there was
significant use of herbicides on the fenced in perimeters of
military bases in Thailand intended to eliminate vegeta-
tion and ground cover for base security purposes."   *Id.*
at 3.   The VA concluded that it would concede herbicide
exposure on a facts-found basis where a veteran could
establish by "credible evidence" that he had served near
the perimeter of particular Air Force bases, including
Udorn, during this time period.   *Id.*   The goal of these
"policy changes," according to the VA, was to expedite
claim processing. *Id.* at 4.

In addition to issuing the Compensation Bulletin, the
VA revised its Adjudication Procedures Manual M21-1
("M21 Manual").   In relevant part, the revised M21 Man-
ual recites steps for evaluating claims of herbicide expo-
sure for veterans with service in Thailand during the
Vietnam Era.   *See* M21 Manual, Part IV, Subpart ii, ch. 1,
§ H, ¶ 5(b), available at https://tinyurl.com/M21Manual.[1]
The first step is to determine if the veteran served at one
of several enumerated airbases in Thailand during the
"Vietnam Era" "as an Air Force [i] security policeman, [ii]
security patrol dog handler, [iii] member of the security
police squadron, or [iv] otherwise near the air base perim-

---

[1]    These steps were originally outlined in Part IV,
Subpart ii, ch. 2, ¶ C.10.q.   They now appear in Part IV,
Subpart ii, ch. 1, ¶ H.5.b.   For clarity, we refer to the
current version of the M21 Manual unless otherwise
stated.   The government has not argued that the language
that appeared in Section C differs from the language as it
appears in Section H.

eter as shown by evidence of daily work duties, performance evaluation reports, or other credible evidence." *Id.* The manual then instructs: "If *yes*, concede herbicide exposure on a direct/facts-found basis." *Id.*

## C. First Board Decision

In May 2012, the Board remanded Hudick's case for further consideration based on the new Compensation Bulletin and M21 Manual revisions. J.A. 34–38. The remand order included specific instructions for adjudicating Hudick's claim. First, the Board directed the Regional Office to inform Hudick "of the evidence required to establish a service connection claim based on Agent Orange exposure and explain[] the manual procedures for addressing claims based on Agent Orange exposure in Thailand." *Id.* at 36–37. Next, the Board told the Regional Office to request additional information from the Department of Defense ("DOD") or the Joint Services Records Research Center ("JSRRC"). *Id.* at 37. With that information, the Board directed the Regional Officer to "readjudicate the claim of service connection for prostate cancer." *Id.* This adjudication was to proceed, the Board explained, based on the "specific procedures" in the M21 Manual.[2] *Id.* at 35–36 ("The United States Court of Appeals for Veterans Claims (Court) has consistently held that evidentiary development procedures provided in the Adjudication Procedures Manual are binding.").

## D. Additional Evidence

After the Board's May 2012 decision, various archivists and agencies reviewed information about Hudick's

---

[2] Because the Board remanded so that Hudick's service in Thailand could be reevaluated based on the new Compensation Bulletin, the Board did not discuss whether the Regional Office erred in concluding that Hudick did not serve in Vietnam.

service and the use of herbicides in Thailand. For example, in July 2012, the JSRRC concluded, based on reviewing relevant unit histories and historical data, that it could not verify whether Hudick was exposed to herbicides while serving at Udorn Air Force Base or whether his duties placed him at the base perimeter there. J.A. 100–01. In January 2014, an archivist with the U.S. Air Force Historical Research Agency concluded that Hudick's commendations did not reflect in-country service in Vietnam. J.A. 41. And in a May 2014 addendum, the archivist also concluded that "herbicides were not used on any USAF Thailand base until April 1969, long after [Hudick] was at Udorn." J.A. 45.

Hudick also submitted an additional statement to the Board on September 15, 2014. In his statement, Hudick explained that his regular duty location was at a munitions storage area "two miles from the main support base on the outer perimeter [at Udorn Air Force Base]." J.A. 53. He also explained that he had frequent contact with aircrafts that had "direct exposure to . . . Agent Orange." *Id.*

### E. Second Board Decision

In September 2015, the Board issued another decision. Although it had previously remanded Hudick's case with clear instructions for the Regional Office to "readjudicate" his claims based on the M21 Manual and the Compensation Bulletin, in its new decision the Board concluded that remand was "unnecessary." J.A. 56. Instead, the Board explained that its exhaustive research demonstrated "substantial compliance" with its previous remand order. *Id.*

On the merits, the Board denied Hudick an entitlement to service connection for his prostate cancer based on his service in Thailand and Vietnam.

As to Vietnam, the Board acknowledged Hudick's repeated assertions that he had served temporary duty assignments in Vietnam, which "were [not] properly recorded as troop movements were classified." J.A. 60. But after examining Hudick's service records, historical information about his unit, and other information, the Board found that, "[d]espite exhaustive research, there is no evidence to confirm that [Hudick] had in-country service in Vietnam." J.A. 60–62.

As to Thailand, the Board began by discussing the M21 Manual and the Compensation Bulletin. It recognized that, under the M21 Manual, "if a Veteran served [at Udorn Air Force Base] . . . during the Vietnam Era and was stationed near the air base perimeter as shown by evidence of daily work duties, performance evaluation reports, or other credible evidence, then herbicide exposure should be conceded." J.A. 58. It also recognized that the Compensation Bulletin established a similar presumption. J.A. 58–60. The Board then found that Hudick was "competent to report . . . working at a munitions storage area away from the central base near the base perimeter in Thailand." J.A. 65. But this "probative evidence," the Board reasoned, "[was] outweighed by review of the Veteran's service personnel records and exhaustive research efforts which resulted in conclusions that contradicted his own and serve as the most probative evidence in the current appeal." *Id.*[3] It therefore found

---

[3]    The Board did not explain what evidence, beyond his "service personnel records" and unspecified "research efforts," had "contradicted" Hudick's account. At most, the Board acknowledged that his records "are silent for the assignment of security duties or other duties along the perimeter [at Udorn Air Force Base]." J.A. 63; *see also* J.A. 64 ("[H]is service personnel records and a specific review of his unit history *does not reveal* that he had

that Hudick "was not near the base perimeter [at Udorn Air Force Base] on a regular basis." J.A. 64. The Board also found that, regardless of whether Hudick placed himself at the base perimeter, the "historical data" showed that herbicides were not used in Thailand until "long after" Hudick was at Udorn Air Force Base. *Id.* ("[T]he available historical data does not document Agent Orange spraying testing or storage [sic] at the [Air Force base] in Udorn, Thailand, during the 1967 and 1968 time frame.").

Hudick appealed the Board's decision to the Veterans Court.

### F. Veterans Court

Before the Veterans Court, Hudick raised two primary arguments. First, he argued that "the Board committed prejudicial legal error by failing to analyze the credibility of his lay statements." *Hudick*, 2017 WL 444516, at *2. Second, he argued that the Board erroneously required him to provide "corroborating evidence . . . to establish that he served near the perimeter of Udorn." *Id.* As to both arguments, Hudick also argued that the Board failed to adequately explain its conclusions.

In a single-judge, non-precedential opinion, the Veterans Court affirmed. It concluded that, because "the Board weighed [Hudick's] statements against the other evidence of record," this "implie[d] that the Board found [Hudick's statements] to be credible." *Id.* The Veterans Court also concluded that Hudick was not entitled to any presumption of exposure based on service in Vietnam or Thailand. *Id.* While Hudick insisted that he performed temporary assignments in Vietnam, the Veterans Court

security or other duty that placed him along the base perimeter." (emphasis added)).

credited the Board's contrary finding. *Id.* And, although Hudick credibly placed himself along the perimeter at Udorn Air Force Base in Thailand, the Veterans Court concluded that "a veteran who served in Thailand during the Vietnam Era is not entitled to any presumption of exposure to herbicides"; thus, Hudick's testimony could not establish an entitlement to any presumptive service connection. *Id.* The Veterans Court did acknowledge that the "VA has created internal agency guidance that allows for herbicide exposure to be conceded for certain veterans who served on or near the perimeter of [Udorn Air Force Base]," but it reasoned that this was irrelevant because "this internal guidance is not binding on the Board." *Id.* And, even if the Board had erred by not applying the M21 Manual, the Veterans Court went on, "any such error would be non-prejudicial, given that the Board found that the evidence clearly demonstrates that herbicides were not used on any USAF base in Thailand until April 1969, after [Hudick] was at Udorn." *Id.* at 3.

Hudick moved for reconsideration, or at least for consideration by a full panel. He argued that the M21 Manual is binding when it reflects a policy statement or instruction by the Secretary to the VA on how to adjudicate individual claims. He also complained that the opinion imposed an impossible burden on veterans. J.A. 96 ("Based on the Court's holding, not only must a Veteran provide lay statements regarding duties on a[n] [Air Force base in Thailand], those statements must be confirmed by independent research in order for VA to abide by its own guidance on the issue.").

His motion was denied. Hudick timely appealed. We have jurisdiction under 38 U.S.C. §§ 7292(a), (c).

## II. DISCUSSION

"This court's jurisdiction to review decisions by the Veterans Court is limited." *Wanless v. Shinseki*, 618 F.3d 1333, 1336 (Fed. Cir. 2010). Absent a constitutional

issue, we "may not review (A) a challenge to a factual determination, or (B) a challenge to a law or regulation as applied to the facts of a particular case." 38 U.S.C § 7292(d)(2). Instead, our jurisdiction extends to "relevant questions of law, including interpreting constitutional and statutory provisions." 38 U.S.C. § 7292(d)(1). On these questions, we review conclusions by the Veterans Court *de novo*. *Wanless*, 618 F.3d at 1336.

Hudick raises two primary arguments on appeal. First, he argues that the Veterans Court ignored controlling law—the Veterans' Dioxin and Radiation Exposure Compensation Standards Act—in finding that he was not entitled to a presumption of service connection for his prostate cancer. Second, he argues that the Veterans Court violated his due process rights by allowing the VA to ignore its own internal policies and rules providing a presumption of service connection in the circumstances at issue here. The government argues we lack jurisdiction as to both issues. Because Hudick's constitutional claim is dispositive, we address that argument first, beginning with the attack on jurisdiction and then turning to the merits.

## A. Jurisdiction

When a veteran challenges a decision by the Veterans Court, we have the authority to "decide all relevant questions of law, including interpreting constitutional and statutory provisions." 38 U.S.C. § 7292(d)(1). This includes the authority to hear "free-standing" constitutional challenges. *See In re Bailey*, 182 F.3d 860, 869–70 (Fed. Cir. 1999). A free-standing constitutional challenge is an attack on the *process* followed rather than the result reached or the validity of an interpretation, statute, or rule upon which the result turned. *Id.* ("[T]his court has jurisdiction over any 'free-standing' constitutional issue, *i.e.*, one not also involving a challenge to the interpretation or validity of a statute or regulation.").

The government argues that we lack jurisdiction to consider Hudick's due process challenge because it is "constitutional in name only." Appellee Br. at 9. According to the government, Hudick's constitutional challenge is not genuine because his due process argument simply repackages a complaint about *how* the Board weighed the evidence in this case, which we cannot review.

Appellant contends that his due process challenge does not require us to consider *how* the Board weighed evidence. Instead, according to Appellant, his due process challenge asks us to consider whether the Board and the Veterans Court erred by ignoring the M21 Manual. If the manual applies and was not followed, Appellant maintains, then he was not afforded due process because, according to the M21 Manual, the Board did not need to weigh the evidence which it claims was dispositive. Accordingly, this appeal turns on *whether* the Board should have weighed evidence, not *how* it did so.

We agree with Appellant. His challenge asks us to consider whether the process followed by the Board and the Veterans Court violated his due process rights. This is a classic example of a free-standing constitutional challenge. *See Cushman v. Shinseki*, 576 F.3d 1290 (Fed. Cir. 2009) (challenge to the procedural fairness of a proceeding rather than the outcome confers jurisdiction).

None of the authorities cited by the government compel a different result. In *Helfer v. West*, 174 F.3d 1332 (Fed. Cir. 1999), for example, we explained that a constitutional challenge does not confer jurisdiction when it simply repackages a challenge to the merits of a Board decision. 174 F.3d at 1335 ("[Appellant] is really arguing the merits of his EAJA claim, not raising a separate constitutional contention."); *see also Geib v. Shinseki*, 733 F.3d 1350, 1354–55 (Fed. Cir. 2013) (concluding that a constitutional challenge did not confer jurisdiction where the claimant challenged the Board's finding that the

evidence presented was inadequate). But Hudick is not simply arguing that the Board incorrectly weighed the evidence in his case. He is arguing that the *process* followed was defective and unfair because the Board, and the Veterans Court, ignored specific procedural rules. We have jurisdiction to consider this argument. 38 U.S.C § 7292.

## B. Due Process

To seek redress under the Due Process Clause of the Fifth Amendment, a claimant must establish that the government denied him or her a property interest to which they were entitled without the process due to them. *Cushman*, _576 F.3d at 1296; *see also Mathews v. Eldridge*, 424 U.S. 319 (1976) (directing courts to consider the private interest at stake, "the risk of an erroneous deprivation of such interest," and the government's interest in deciding whether a claimant is entitled to some process or procedure).

Neither side disputes that Hudick has a property interest in this case. *See, e.g.,* Appellee Br. at 24 ("This Court has found that a veteran has a constitutionally protected property interest in veterans benefits." (citing *Cushman*, 576 F.3d at 1298)). We therefore turn to what process was due and whether that process was denied.

## 1. The VA Cannot Ignore Its Own Rules

Agencies must follow their own rules. *See, e.g., Crediford v. Shulkin*, 877 F.3d 1040, 1047 (Fed. Cir. 2017). In *Crediford*, this meant the VA could not ignore a line of duty investigation by the agency because its own regulations required the investigation to at least be considered. 877 F.3d at 1046–47. We therefore remanded the case for further consideration, noting that the VA needed to follow its own rules and regulations. *See also United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954).

Even when an agency's rules are more generous than they are required to be by statute, these rules still must be followed. *See Vitarelli v. Seaton*, 359 U.S. 535, 539 (1959); *Voge v. United States*, 844 F.2d 776, 779 (Fed. Cir. 1988) ("It has long been established that government officials must follow their own regulations, even if they were not compelled to have them at all . . . ."). For example, in *Vitarelli*, even though the Secretary for the Department of the Interior was allowed to terminate employees without giving any reason, once he "gratuitously decided to give a reason, and that reason was national security, he was obligated to conform to the procedural standards he had formulated in Order No. 2738 for the dismissal of employees on security grounds." 359 U.S. at 539. Because he did not, "such dismissal was illegal and of no effect." *Id.* at 545.

Even when an agency's rules lack the force of law, it may still be compelled to follow them. *See, e.g., Morton v. Ruiz*, 415 U.S. 199 (1974). This is why, in *Morton*, the Bureau of Indian Affairs could not deny benefits to an applicant based on unpublished criteria where its internal guidance manual required such criteria to be published. *Id.* at 234–35. As the Supreme Court explained: "Before the BIA may extinguish the entitlement of these otherwise eligible beneficiaries, it must comply, at a minimum, with its own internal procedures." *Id.* at 235. And in *Frizelle v. Slater*, 111 F.3d 172, 177 (D.C. Cir. 1997), the D.C. Circuit concluded that, although "rules in the [Coast Guard] Personnel Manual may not qualify as binding regulations for all purposes," they should be treated as binding where the Coast Guard Board of Military Records viewed them as such. 111 F.3d at 177 ("The Board thus treated the rule [in the Personnel Manual] prohibiting reference to matters outside the reporting period as binding upon it, and we defer to its judgment.").

Against this backdrop, the government suggests there is no due process problem here because the M21 Manual

is not binding and can therefore be freely ignored. Appellee Br. at 21 ("To the extent Mr. Hudick means to assert that the board must follow the Manual . . . he effectively argues that the Manual must be treated as binding even when it is not."). This argument misapprehends our precedent and ignores the unique facts of this case.

In two previous cases, on which the government relies, we noted that the M21 Manual is not necessarily binding on the Board. *See Disabled American Veterans v. Sec'y of Veterans Affairs*, 859 F.3d 1072 (Fed. Cir. 2017) ("*DAV*"); *Gray v. Sec'y of Veterans Affairs*, 875 F.3d 1102 (Fed. Cir. 2017). But neither of these cases suggested that the Board could ignore the M21 Manual or other VA policies whenever it wants. Instead, both cases turned on how and in what forum veterans may challenge aspects of the manual. In *DAV* and *Gray*, we explained that, because the VA does not generally consider M21 Manual provisions binding, a veteran must challenge these provisions on an as applied basis. *See, e.g., DAV*, 859 F.3d at 1078 ("Where, as here, manual provisions are interpretations adopted by the agency, not published in the Federal Register, not binding on the Board itself, and contained within an administrative staff manual, they fall within § 552(a)(2)—not § 552(a)(1)" and thus we lack jurisdiction to review them until provisions are "applied to the facts of [a veteran's] case"); *Gray*, 875 F.3d at 1109 ("We must await an individual action to assess the propriety of the VA's interpretation of the Agent Orange Act and attendant regulations.").

The procedural history here is materially different. When Hudick's claim reached the Board the first time, the Board remanded the case so that his claim could be "readjudicate[d]" according to the "specific procedures" of the M21 Manual. J.A. 36–37. Based on this instruction, Hudick submitted additional evidence that credibly placed him near the perimeter of Udorn Air Force Base, which is all that was required of him by the M21 Manual.

J.A. 52–53; *Hudick*, 2017 WL 444516, at *2 (noting that the Board found Hudick's statements credible). But the Board never finalized its remand order. Instead, in a second decision, the Board concluded that remand was "unnecessary." J.A. 56. It then proceeded to adjudicate Hudick's claim without resort to the M21 Manual.

The government now argues that, even though the Board told Hudick that his claim would be adjudicated based on the M21 Manual and the Compensation Bulletin, the Board was free to ignore these authorities if it wanted to do so. We cannot agree. Regardless of whether the M21 Manual is binding on the Board in all cases and setting aside the question of whether the Compensation Bulletin is binding VA policy, the Board made these authorities binding here. Put simply, once the Board told Hudick his adjudication would be governed by the M21 Manual and the Compensation Bulletin, inviting him to submit evidence reflecting compliance with the provisions of the M21 Manual and Compensation Bulletin, it was not free to ignore these authorities in adjudicating his claim. *See Frizelle*, 111 F.3d at 177; *Crediford*, 877 F.3d at 1047.

The contrary conclusion by the Veterans Court is difficult to reconcile with its own practice[4] or the guarantee

---

[4] *See, e.g.*, *Workman v. Shinseki*, No. 08-3500, 2010 WL 2912254, at *5 (Vet. App. July 23, 2010) (unpublished) ("On remand, the Secretary is instructed to apply the newly established procedures in the above-cited bulletin to Mr. Workman's claim."); *Hildebrandt v. McDonald*, No. 14-0090, 2015 WL 65578, at *7 (Vet. App. Jan. 6, 2015) (non-precedential) ("The Board's failure to consider this particular theory of service connection is particularly egregious given the numerous prior Board remands to develop evidence pertinent to that theo-

of procedural fairness provided by the Due Process Clause. *See Honda Motor Co. v. Oberg*, 512 U.S. 415, 430 (1994) ("When the absent procedures would have provided protection against arbitrary and inaccurate adjudication, this Court has not hesitated to find the proceedings violative of due process."). It cannot be that the VA may tell a veteran how to establish a service connection for his prostate cancer only to move the goalposts once he has done so. "This kind of goalpost-moving does not reflect an optimal mode of administrative decisionmaking." *Qwest Corp. v. F.C.C.*, 689 F.3d 1214, 1228 (10th Cir. 2012). Indeed, it reflects an arbitrary one. *See F.E.R.C. v. Triton Oil & Gas Corp.*, 750 F.2d 113, 116 (D.C. Cir. 1984) ("The Commission may not abuse its discretion by arbitrarily choosing to disregard its own established rules and procedures in a single, specific case."). Such an arbitrary process does not comport with due process, particularly given the important benefit at stake for Hudick. *See Cushman*, 576 F.3d at 1297 n.1 ("The right to a hearing necessarily implies the right to a fair hearing."). We therefore need not, and do not, decide whether these specific M21 Manual provisions or the Compensation Bulletin are binding in every case. Instead, our holding rests on the conclusion that the Board made these authorities binding in this case.

Having concluded that Hudick did not receive a fair hearing because the Board refused to apply rules it told Hudick would govern his adjudication, we next address the government's argument that this error was harmless.

2. Applying the VA's Rules

Under the M21 Manual, the VA concedes herbicide exposure if a veteran provides credible evidence showing

---

ry . . . and VA's express policy to concede such exposure in cases like Mr. Hildebrandt's.").

that they were "otherwise near the air base perimeter" at Udorn Air Force Base in Thailand. There is no dispute that Hudick did exactly that. As the Veterans Court explained, the Board found Hudick's statements, including his statements placing him near the perimeter of Udorn Air Force Base, to be credible. *Hudick*, 2017 WL 444516, at *2. The VA should have therefore conceded exposure based on the M21 Manual and the Compensation Bulletin.

According to the government, however, the manual does not require an adjudicator to always concede exposure. Instead, the adjudicator should weigh all the evidence to conclude whether a veteran served at or near a relevant base perimeter. Only upon making such a finding, the government argues, must the VA concede exposure. The government therefore maintains that the Board correctly applied the manual because it weighed Hudick's statements against other evidence to conclude that Hudick did not serve at the base perimeter. Assuming the government's interpretation of the M21 Manual is correct, its argument still fails. The Board did not identify or analyze any evidence that cut against Hudick's claim that he served near the base perimeter at Udorn Air Force Base. At most, it acknowledged that other evidence did not corroborate Hudick's statements. J.A. 63 (noting that his unit histories and performance reviews "are silent for the assignment of security duties or other duties along the perimeter of [Udorn Air Force Base]"). But the M21 Manual did not require Hudick to provide *corroborated* evidence. It required him to provide *credible* evidence.[5] Hudick did that.

---

[5] The Compensation Bulletin draws the distinction between corroborated and credible evidence explicitly with respect to other types of service members. For example, in discussing United States Army personnel

The government insists that any error in applying the manual or other policies is harmless here because an archivist found that no herbicides were used at Udorn Air Force Base until after Hudick left. But under the adjudicatory framework established by the VA in the Compensation Bulletin and the M21 Manual, the archivist report is irrelevant. Hudick need only establish that he worked at or near the perimeter at Udorn Air Force Base. If he does so, the VA has agreed to concede exposure to herbicides given its own determination about how, when, and where herbicides were used in Thailand:

> After reviewing documents related to herbicide use in Vietnam and Thailand, *C&P Service has determined that there was significant use of herbicides on the fenced in perimeters of military bases in Thailand* intended to eliminate vegetation and ground cover for base security purposes. Evidence of this can be found in a declassified Vietnam era Department of Defense (DoD) document titled Project CHECO Southeast Asia Report: Base Defense in Thailand. *Therefore, when herbicide related claims from Veterans with Thailand service are received, RO personnel should now evaluate the treatment and personnel records to determine whether the Veteran's service activities involved*

---

stationed at air bases "[d]uring the early years of the war in Vietnam," the Compensation Bulletin requires these veterans to establish their perimeter duty through a "lay statement" and *"additional credible evidence supporting this statement*." Compensation Bulletin at 4 (emphasis in original). The section discussing United States Air Force personnel, however, contains no similar directive. It simply says that the veteran must provide credible evidence, not "additional credible evidence" beyond a lay statement. *Id.* at 3.

> *duty on or near the perimeter of the military base where the Veteran was stationed . . .* this applies only during the Vietnam era, from February 28, 1961 to May 7, 1975.

Compensation Bulletin at 3 (emphasis added). Hudick's service in Thailand fell squarely within the VA's own timeline. The Board's failure to follow its own rules or VA guidance, and the Veterans Court's refusal to hold the Board to those rules, is therefore not harmless error because Hudick should have prevailed under the proper adjudicatory framework based on facts already found by the Board. [6]

### III. CONCLUSION

Having concluded that the Board did not apply the rules and authorities it told Hudick would govern his adjudication, and that this error was not harmless, we further conclude that remand for further consideration of the facts relating to his service is not necessary. Indeed, as explained above, the Board has already found that Hudick provided credible evidence that he served near the base perimeter at Udorn Air Force Base. Because no additional findings are necessary to establish that Hudick is entitled to service connection for his prostate cancer according to the M21 Manual and the Compensation Bulletin, it would make little sense to remand for further consideration and delay. For this reason, and for the reasons stated above, we *reverse* the Board's denial of benefits to Hudick and *remand* for purposes of finalizing an appropriate award of the same.

---

[6] Because Hudick prevailed on his alternative argument, we need not address his argument that the Veterans Court erred in its application of the Veterans' Dioxin and Radiation Exposure Compensation Standards Act.

**REVERSED AND REMANDED**

COSTS

No costs.